EQUITABLE TRUST CO. of NEW YORK v. WESTERN PAC. RY. CO.

(District Court, N. D. California, Second Division. February 21, 1916.)

No. 169, In Equity.

1. COURTS ⬤═526—PRIORITY OF JURISDICTION OF SUBJECT-MATTER—PROTECTION BY INJUNCTION.

A court of equity may always control the parties of whom it has acquired jurisdiction in a suit before it for the purpose of protecting its jurisdiction of the subject-matter of the controversy from being in any wise interfered with or jeopardized, and an order to that end, although it may indirectly arrest, through a party, the prosecution of an action in another court, is not an invasion or interference with the jurisdiction of the latter tribunal.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1449; Dec. Dig. ⬤═526.]

2. COURTS ⬤═526—PRIORITY OF JURISDICTION—PROTECTION BY INJUNCTION.

A court of equity which has, through its receivers, taken possession of the property of an insolvent corporation at suit of creditors has the right, and it is its duty, to retain and protect its prior jurisdiction for the determination of all matters essential to the full, final, and complete administration of the property and rights involved, and will to that end enjoin any party before it from proceeding in another jurisdiction to try any question so connected with the controversy, or involving any of the rights concerned in such way as to interfere with its primary jurisdiction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1449; Dec. Dig. ⬤═526.]

3. COURTS ⬤═526—PRIORITY OF JURISDICTION—PROTECTION BY INJUNCTION.

Defendant railroad company entered into a number of contracts to which the Denver & Rio Grande Railroad Company and other railroad companies were parties. These contracts contained provisions by which advances were to be made to defendant for the completion and equipment

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of its road, in consideration of reciprocal covenants and mutual traffic agreements which the parties, respectively, were given the right to specifically enforce. The Denver Company agreed to advance money necessary, in addition to defendant's net earnings, to meet interest and sinking fund payments on its bonds. At the same time a mortgage was executed by defendant securing the bonds which covered the contracts, and the trustee was authorized to enforce the same for the benefit of the bondholders. The trustee brought suit to foreclose the mortgage, and receivers were appointed for all of the mortgaged property. *Held* that the mortgage and contracts, having been executed at the same time and as parts of the same transaction, were to be construed together; that the foreclosure suit brought all of the contracts within the jurisdiction of the court for the determination of the reciprocal rights of the parties thereunder; that complainant would be enjoined from maintaining a suit in another jurisdiction to enforce separately the agreement of the Denver Company to make advances for interest and sinking fund payments, and incidentally to require an accounting of earnings by defendant, but that complainant would have leave to bring into the suit as parties all parties to the contracts whose interests might be affected.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1449; Dec. Dig. ☞526.]

In Equity. Suit by the Equitable Trust Company of New York against the Western Pacific Railway Company. On order to show cause why complainant should not be restrained from further prosecuting a dependent suit in the District Court for the Southern District of New York. Order of injunction granted.

The matter before the court grows out of an order heretofore made in the above cause, requiring the plaintiff herein to show cause why it should not be restrained from further prosecuting a certain action brought by it in the District Court for the Southern District of New York.

The record is voluminous, but the material facts underlying the order may be thus summarized: The plaintiff heretofore, in March, 1915, in its capacity as successor to the Bowling Green Trust Company, the original trustee under a first mortgage or deed of trust made by the defendant, a California corporation, to secure an issue by it of $50,000,000 in bonds, filed its bill in this court, alleging the insolvency of the defendant and its default in the payment of interest on its bonds, and praying a foreclosure and sale of the mortgaged property, and the appointment of a receiver to take charge of the road pending litigation and the marshaling of the assets of the insolvent. Thereupon the court made its order appointing two receivers to jointly take possession of the property of the corporation, consisting of its railroad and other property of every character, including all contracts, choses in action, accounts, claims, etc., with full and ample powers to operate the road, manage, conserve, and realize on its property, and to that end to sue for and enforce any and all rights existing or arising thereon, or flowing therefrom, and to defend any actions brought involving said property, or any part thereof, and restraining any and all persons from in any wise disturbing or interfering with the possession or control of the receivers in any way. Under this order, the receivers at once qualified and took possession and control of the property, entered upon its management, and have since continued to operate it under the direction and supervision of this court.

Of the property of the defendant thus committed to the care and control of the receivers were a large number of contracts and obligations theretofore entered into by and on behalf of the defendant, and still subsisting, between it and other corporations, including the Denver & Rio Grande Railroad Company, the Rio Grande Western Railway Company (and its successor), the Salt Lake City Union Depot & Railroad Company, the Missouri Pacific Railway Company, the Utah Fuel Company, and certain trust companies, such contracts involving intricate and complicated relations between the contracting parties and affecting the management, operation, and control of the property of this

defendant, and that of the other parties thereto as a result of the reciprocal covenants and mutual obligations and duties created by their terms.

Three of these contracts, known in the annals of the defendant and in these proceedings as contracts A, B, and C, were, in pursuance of a preliminary contract entered into between the Denver & Rio Grande, the Rio Grande Western, and this defendant, executed contemporaneously with the mortgage in suit, and, by the terms of the latter instrument, and those of the several contracts as well, were pledged and conveyed under the mortgage with the physical properties of the defendant as security for the bonds which it was given to secure.

As evidencing the nature of the consideration moving the execution of these particular contracts, and the relations and obligations created by their mutual covenants, their several provisions may be generally stated, especially as they bear more or less directly upon the matter presented for consideration. Contract A was between the Rio Grande Western and this defendant as first and second parties, respectively, and the trustee under the mortgage as third party. It recites the fact that the Western Pacific was then under construction, "and will be of great advantage and benefit" to both first and second parties "as a part of a main artery of transportation for Pacific Coast traffic between San Francisco and points in Colorado and east thereof," and that the first party "for the purposes of this agreement, controls substantially all of the capital stock" of second party, the Western Pacific. It then provides that first party shall have the right to use the main line of the Western Pacific as long as the latter's first mortgage bonds are outstanding and unpaid; that all the stock of the latter shall be held by the trustee under the mortgage; that its capital stock shall be increased from $50,000,000 to $75,000,000, the additional stock to be taken by first party and pledged under the first mortgage in like manner; that the Western Pacific is to create an issue of second mortgage bonds in the sum of $25,000,000, which will be purchased by first party at 75 per cent., to the extent necessary to complete and equip the Western Pacific, after the sum realized from the first mortgage bonds shall be exhausted. It also guarantees the equipment of the Western Pacific with rolling stock in accordance with a schedule attached thereto. This is its substance. The Denver & Rio Grande Railroad has succeeded to the rights and assumed all the obligations of the Rio Grande Western under this contract.

Contract B was between the Denver & Rio Grande, designated therein as the "Denver Company," and the Rio Grande Western, designated the "Western Company," as parties of the first part, the Western Pacific, designated the "Pacific Company," as second party, and Bowling Green Trust Company, as trustee under the mortgage in suit, designated as "Trustee," party of the third part. In its fullness, contract B is a voluminous document, with many and very elaborate provisions in great detail for exchange of traffic, furnishing of equipment, operation of through trains, and other matters relating to the physical operation of the properties of the contracting parties in various respects. As to most of these provisions, it will be sufficient to state their purport.

It recites that the Denver Company had no outlet to the Pacific Coast not controlled by a competitor, and that the Western Pacific, when completed, would, with the Denver Company, constitute a through line as a main artery of traffic from Pueblo, Colo., to San Francisco, Cal. By its terms, the Denver Company agrees to deliver to the Western Pacific all its west-bound traffic, whether originating on its own lines or not; to furnish to the Western Pacific sufficient freight cars to handle its tonnage; to purchase semiannually promissory notes of the Western Pacific sufficient in amount to make up any deficiency in operating expenses, taxes, and interest and sinking fund on its first mortgage bonds, and any other expenses necessary to insure the continued and efficient operation of the Western Pacific. In return for these considerations, the Western Pacific agrees to turn over to the Denver all its east-bound traffic so far as lawful; makes provision for a through passenger service over the contracting roads, together with an express grant to the Denver Company of the right to use the main line of the Western Pacific for through passenger trains each way daily. The Western Pacific covenants and guarantees that it will apply all its gross earnings and income to the payment of

its operating expenses, taxes, interest on first mortgage bonds, sinking fund and any other expense necessary to insure the continued and efficient operation of the road, and to faithfully apply any surplus of its earnings after making such payments to the satisfaction, in order of priority, of the advancements made to it by the Denver Company. The contract by its terms expressly provides for the enforcement of any and all of its provisions, either by the Western Pacific Company or the trustee or both, and it further provides that its provisions and obligations shall "run with the railways" of each of the contracting parties, and be binding upon them into whosesoever hands they may come. Certain of the provisions of the contract thus stated generally, constituting what have been denominated in argument as the "financial provisions" or "guaranty clauses," being more material to present consideration, will be found stated in the margin in the language of the contract, since it is these features of contract B which have given rise to the immediate controversy before the court.

By virtue of its succession to the rights of the Bowling Green Trust Company, original trustee under the mortgage in suit, the plaintiff here has succeeded that corporation as trustee under this contract; and the Denver & Rio Grande Railroad Company has, by merger, succeeded to the rights and assumed the obligations under this contract of the original parties of the first part thereto.

Contract C, briefly stated, is an agreement entered into between the Missouri Pacific Railway Company (called the "Missouri Company"), as party of the first part, and the Denver & Rio Grande Railroad Company (called the "Denver Company"), as party of the second part; but it recites that it is made for the benefit of the Western Pacific, and the latter company is expressly therein given the right to enforce specific performance of its provisions. In effect, it establishes the Denver Company, the Missouri Company, and the Western Pacific as one continuous through line from east of the Mississippi to the Pacific Coast, the recital being that "the railway lines of the parties to this agreement, and especially their main east and west lines, together form a through line of connected railway, constituting a main artery of traffic between points on the east of the Mississippi river on the one hand and points in and west of the state of Utah, and it is greatly to the advantage of each and both of the parties hereto that their lines connecting as aforesaid should be operated under close traffic relations as a joint through line," etc. It incorporates the provisions of contract B, and gives the Missouri Company the right specifically to enforce the traffic arrangements therein provided for, both as against the Denver Company and the Western Pacific.

On the 19th day of May, 1915, the receivers filed in this court a petition, setting forth copies of all the contracts and obligations above referred to, including contract B, and also a second mortgage for $25,000,000, given by defendant to the Central Trust Company of New York. In this petition they state that since their appointment they have been, and are now, "diligently investigating all matters and things in connection with said contracts, and particularly the relations now and heretofore existing between said Western Pacific Railway Company and said the Denver & Rio Grande Railroad Company. That said investigation requires the solution of numerous and difficult questions of law, and likewise questions with regard to whether or not all of said contracts are to the best interests of the property and business of said Western Pacific Railway Company committed to the charge of your receivers, and that the same likewise requires an investigation of existing complicated facts, figures, and records, and that your receivers are therefore unable to state at the present time to what extent said contracts should be ratified and affirmed, or what the full duty of your receivers is in regard to the same. * * * That your receivers desire to carry out and enforce the said contracts to the fullest extent necessary, in order to preserve the best interests of all persons interested in or having claims against the said Western Pacific Railway Company, and that, therefore, your receivers desire the advice of said honorable court with relation thereto, at such time as your receivers may be in position to fully present all facts with relation thereto to said court, and that in particular your receivers desire the advice and direction of this court to enable them to take all proceedings necessary and proper, to the end that the

231 F.—31

value of the bonds issued under the first mortgage or deed of trust hereinbefore mentioned may not be in any wise lessened or impaired, and that your receivers are of the opinion that it will require a period of approximately six months to complete their investigations and make their report thereon."

The prayer of the petition was for a grant of the time indicated for the purposes of the necessary investigation, and that upon its completion the receivers be directed "to present to this court all matters and things in connection with said contracts, and all other arrangements, agreements, conventions, and modifications in connection with the said relations of said Western Pacific Railway Company with said the Denver & Rio Grande Railroad Company and said Missouri Pacific Railway Company, and that upon the presentation of said facts, the court set a day for the hearing thereof, and direct that due and ample notice be given thereof."

Upon the filing of this petition, the court made its order directing that the same be heard on the 14th day of June, 1915, and that notice of such hearing be served on the parties to this action and all corporations parties to any of the contracts involved, which order was duly complied with.

On the 26th day of May, 1915, the plaintiff herein filed in the United States District Court for the Southern District of New York its ancillary bill, the same in all respects as the bill filed in this court, and an order was therein made, appointing as receivers in that district the same persons appointed receivers here. On the next day, May 27, 1915, the plaintiff filed in said last-named court its bill entitled as of the ancillary bill in that court, with the subtitle of "Ancillary Dependent Action in Equity," and naming as defendants therein the Denver & Rio Grande Railroad Company, the Western Pacific Railway Company, the defendant herein, and two fictitious defendants. Both the ancillary bill and said dependent bill were filed without application to or leave of this court, and without its knowledge.

This dependent bill, after alleging the execution and delivery to its predecessor of the mortgage deed in suit, a copy of which is attached to the bill, alleges the making and pledging of contract B thereunder; states the terms of the latter, and particularly so far as they relate to the obligation of the Denver Company thereunder to pay "such sum of money as should be necessary in addition to the earnings of the Western Pacific Company and other moneys actually and lawfully appropriated by it for the purpose, to meet the interest and sinking fund payments upon the issue of bonds secured by the said first mortgage and provided for therein"; alleges that the obligation of the parties under the contract run with the railroads of the parties; and then proceeds to allege various defaults of the Denver Company under the contract and a failure on the part of the Western Pacific as well to comply with its terms. In this respect it is alleged, among other things: "That as your orator is informed and believes, and therefore avers, the Western Pacific Company has, at various times and during various periods since March 1, 1908, made and received earnings and other income which might properly have been lawfully appropriated and paid by it to the mortgage trustee on account of one or both of the said classes of payments, to wit, sinking fund payments and interest payments, as aforesaid, but the amount thereof is unknown to your orator, save as your orator is informed and believes and therefore avers that the same was insufficient upon the maturity of each semiannual payment due to the sinking fund, as aforesaid, and upon the maturity of each semiannual installment of interest, as aforesaid, to pay or meet the whole thereof; and that, under the provisions of the said contract B, a liability and obligation arose on the part of the defendant the New Denver Company upon the occasion of the maturity of each such semiannual installment of interest and upon the occasion of the maturity of each such semiannual payment due to the sinking fund, to pay to the said mortgage trustee a sum which, together with any income theretofore actually paid by the Western Pacific Company to the mortgage trustee for that purpose, should make up the whole sum then due for a sinking fund payment or interest payment, as aforesaid, but the exact amount of such deficiency or such liability is to your orator unknown."

The bill then sets out the proceedings in this court, as a court of primary jurisdiction, and the ancillary suit brought in New York; alleges that it is the intention of plaintiff to shortly declare the principal due, and obtain a de-

cree of foreclosure and sale; and avers that the amount realized will probably be less than the face of the bonds. It then proceeds: "That by reason of the uncertainty, as hereinbefore set forth, as to the amount of earnings of the Western Pacific Company from time to time heretobefore or hereafter applicable to said sinking fund payments or hereafter to said interest installments, your orator is not informed as to the exact amount for which the defendant the New Denver Company is liable under the terms of said contract B, in respect either of payments due from time to time to the said sinking fund or for said installments of interest or by reason of the breach of said contract as a whole. That the true amount thus due and the true amount of such liability can appear only upon an accounting, to be had under the direction of this honorable court, ascertaining the amount of such earnings so applicable and the amount of deficiency therein for which the defendant the New Denver Company is liable as aforesaid, and that also, in view and because of the various defaults of the New Denver Company, hereinbefore set forth, that company is liable to your orator for a total or gross sum in liquidation of its total future liability under said contract B, and also under the said guaranties, but such total or gross sum can only be ascertained and fixed by an accounting and adjudication by this honorable court proceeding in due course upon equitable principles. That your orator is informed and believes that adverse claims in respect of the amount earned and the amount due are made by the defendant the Western Pacific Company and the defendant the New Denver Company, which can be resolved and determined only on such an accounting as aforesaid, to which both of the said companies shall be parties, and that the defendant the New Denver Company is liable herein for the amount of the deficiency appearing upon such an accounting in respect of the said sinking fund payments, of the said interest payments, and the amount fixed in respect to the future liability of said defendant."

The bill prays for a determination of the meaning of contract B, particularly as to its interest and sinking fund provisions; for an accounting against the Western Pacific and a determination of the amount which will remain due after the foreclosure sale; for a determination whether contract B constitutes a lien on the railroads of the parties; for a receiver of the Denver & Rio Grande, and the application of its property to the lien of contract B; and for an injunction against the fictitious defendants.

Upon knowledge of the filing of the said ancillary and dependent bills coming to the receivers, they brought the matter to the attention of this court by a petition setting forth the facts as to the filing of said bills and the status of the litigation in this court, and asking instructions as to their duty in the premises, and whether a suit to enforce the provisions of contract B should not be brought in this court. As a result of the hearing of this petition, the court made the order in question, requiring that the plaintiff show cause in this court on June 21, 1915, why it should not be enjoined from further prosecuting said dependent bill, and in the meantime that it refrain from taking any further step therein until the further order of the court; and the hearing on the first petition of the receivers set for June 14th was thereupon continued to be heard at the same time.

At the hearing of the order to show cause, the plaintiff presented an answer, challenging the jurisdiction of this court to issue an injunction restraining the dependent suit as an invasion of the jurisdiction of the New York court, alleging that plaintiff is the only person authorized to enforce contract B, and that an injunction preventing it will violate the "due process" clause of the Constitution; that the suit is properly cognizable in the District Court of the Southern District of New York; that the Denver & Rio Grande Railroad Company is not subject to the jurisdiction of this court; and that the plaintiff, in so far as its rights under contract B are concerned, is not subject to the jurisdiction of this court; and some other matters which have not been pressed and need not be noticed. The answer is accompanied by the affidavits of the president of the plaintiff and the attorney for the bondholders' committee. They disclose facts tending to show the actuating motive in bringing the dependent suit, and why, in the judgment of the plaintiff, it is made desirable for the purpose of enjoining suits against the Denver Company on its independent guaranty, stamped on certain of the bonds of defendant, that

the suit be permitted to proceed in New York, and that it was so requested and desired by the bondholders' committee; but they state no facts affecting the legal aspects of the question involved, and call for no extended statement of their contents.

There was also submitted at the hearing the petition of the receivers of May 18, 1915, and an affidavit by the attorney for the receivers which together laid before the court the entire body of contracts and obligations heretofore referred to as coming to the hands of the receivers.

This statement comprises the material facts bearing on the present controversy.

Jared How, of San Francisco, Cal., and Murray, Prentice & Howland, of New York City, for plaintiff.

John S. Partridge and Garret W. McEnerney, both of San Francisco, Cal., for receivers.

Byrne & Cutcheon, of New York City, and Charles S. Wheeler and John F. Bowie, both of San Francisco, Cal., for bondholders' committee.

Charles W. Slack, of San Francisco, Cal., Amicus Curiæ.

VAN FLEET, District Judge (after stating the facts as above). While the facts are, as suggested, somewhat voluminous, and the arguments and briefs in keeping, I am unable to regard the questions which I deem necessary to be decided as involving anything of great magnitude, and although of importance as affecting the jurisdiction of this court, the orderly administration of justice, and the rights of the parties, they involve little novelty. The argument, however, has taken a wide range, and it may be well to suggest at the threshold that I do not feel called upon to follow it in all its ramifications, or even to notice some of the contentions advanced.

Much has been made, for instance, of the question raised by the dependent bill, whether the so-called guaranty or financial provisions of contract B, stipulated to "run with the railways" of the contracting parties, constitute a lien for the benefit of the bondholders of defendant on the road of the Denver Company; and the fears of the latter company have been excited to the point of having its counsel appear (amicus) to combat that proposition. But while I so far agree with the theory prompting the bringing of the dependent suit that, before the assets of the defendant can be adequately marshaled and the rights of the bondholders and the creditors fully protected, it will be necessary to construe that contract and have its effect determined in the respect suggested—if not, indeed, in all others—manifestly, as objected by both counsel for plaintiff and the bondholders' committee, that question cannot competently be decided—

"in any proceeding to which neither the Denver & Rio Grande Railroad Company nor the trustees of the deeds of trust securing the adjustment or refunding bonds of that company are parties, because no binding adjudication can be rendered in their absence."

The question is much too important, not alone to the holders of obligations of the Denver Company, but to the bondholders under both the first and second mortgages of the defendant and the holders of other obligations of defendant as well, to admit of its being complicated by any mere moot or inconclusive consideration. Moreover, the

question is one which, as intimated, is in no wise essential to the determination of the real question now before the court. It may therefore be laid to one side.

[1] As to the objection raised by the answer, which has been suggested rather than urged at bar, that the court, in restraining plaintiff from prosecuting the dependent suit, will be invading the jurisdiction of the New York court, I doubt if it is seriously made; but it is without merit. A court of equity may always control the parties of whom it has acquired jurisdiction in a suit before it, for the purpose of protecting its jurisdiction of the subject-matter of the controversy from being in any wise interfered with or jeopardized; and an order to that end, although it may indirectly arrest, through a party, the prosecution of an action in another court, is not, in the sense of the objection, an invasion or interference with the jurisdiction of the latter tribunal. The objection was sufficiently answered by the court at the argument in referring to the limitations of its order, when it stated:

"This court has no power over the court in New York, and would not assume for a moment that it could dictate to it in any wise. It is perfectly competent to take care of itself. The court has, however, I think, plenary and complete jurisdiction of the plaintiff in this case. Whether the plaintiff has transgressed its rights under the order heretofore made by this court in proceeding to bring that action without the advice of this court, or without authority first had, is a different question. * * * The plaintiff in that suit is unquestionably within the jurisdiction of this court because it has submitted itself to this court."

Obviously, there was and is no purpose to interfere in any direct or positive way with the jurisdiction of the sister court, nor does the order have any such effect.

[2] As disclosed by the facts, the substantive question presented, and from which all subsidiary considerations flow, is this: Does the so-called dependent suit involve a subject-matter previously submitted by the plaintiff in that action to the jurisdiction of this court in the main suit, and which is essential to a full, complete, and orderly adjudication of the rights of the parties involved in the controversy presented by the bill filed here? If it does, no question can seriously be made as to the right of this court to interfere through its coercive power over the plaintiff to stop the further prosecution of that suit. It is too thoroughly settled to call for any extended consideration that the court which first takes jurisdiction of a controversy such as that submitted by the bill filed in this court, seizes upon the property of the insolvent through its receivers, and proceeds to marshal and realize upon the assets for the benefit of all concerned, has not only the right, but it is its duty, to retain and protect such jurisdiction for the determination of all matters essential to the full, final, and complete administration of the property rights involved, and should and will to that end enjoin any party before it from proceeding in another jurisdiction to try any question so connected with the controversy or involving any of the property rights concerned in such way as to interfere with such primary jurisdiction. The rule is thus stated in Wabash v. Adelbert College, 208 U. S. 38, 28 Sup. Ct. 182, 52 L. Ed. 379:

"When a court of competent jurisdiction has, by appropriate proceedings, taken property into its possession through its officers, the property is thereby withdrawn from the jurisdiction of all other courts. The latter courts, though of concurrent jurisdiction, are without power to render any judgment which invades or disturbs the possession of the property while it is in the custody of the court which has seized it. For the purpose of avoiding injustice which otherwise might result, a court, during the continuance of its possession, has, as incident thereto and as ancillary to the suit in which the possession was acquired, jurisdiction to hear and determine all questions respecting the title, the possession, or the control of the property."

And in Alderson on Receivers, § 4, the cognate principle, fully sustained by the authorities, is thus stated:

"A court, by appointing a receiver, takes the subject-matter of the litigation out of the control of the parties and into its own hands, and holds it pending the proceeding and until the final disposal of all questions, legal or equitable, involved in the action. Since the receiver's possession is that of the court appointing him, any attempt to disturb it without leave of the court is a contempt of court and may be punished accordingly."

See, also, French v. Hay, 22 Wall. 250, 22 L. Ed. 854; Dietzsch v. Huidekoper, 103 U. S. 494, 26 L. Ed. 497; Moran v. Sturges, 154 U. S. 256, 14 Sup. Ct. 1019, 38 L. Ed. 981.

And this control of a party extends to acts done beyond, equally with those done within, the territorial jurisdiction of the court. Thus, in French v. Hay, 22 Wall. 250, 22 L. Ed. 854, the Supreme Court say:

"The court, having jurisdiction in personam, had power to require the defendant to do or to refrain from doing anything beyond the limits of its territorial jurisdiction which it might have required to be done or omitted within the limits of such territory."

See, also, Watts v. Waddle, 6 Pet. 391, 8 L. Ed. 437; Lewis v. Darling, 16 How. 1, 14 L. Ed. 819.

[3] It is not questioned that ordinarily a piece of collateral like contract B, constituting a part of the mortgaged property, would, by the filing of the bill to foreclose, be fully subjected to the jurisdiction of the court, and such without doubt was the result in this instance, unless it is avoided by plaintiff's claim as to the effect of particular terms of that contract. Indeed, the court had not only taken general jurisdiction under the bill, but the specific subject-matter of that contract and all others affecting the property and rights of the defendant had been specifically submitted to it by the petition of the receivers of May 18, 1915. There can be no doubt, therefore, that the court, in the absence of some special or exceptional consideration, had been clothed with full jurisdiction to adjudicate on this particular piece of property before the dependent bill was filed.

The theory advanced by the plaintiff, however, and upon which it is claimed the dependent bill was filed in another jurisdiction, is embodied in the contention that the provisions of contract B, set forth in the margin,[1] whereby the Denver Company covenants to pay to the trustee sufficient funds to meet the semiannual interest on the defendant's first mortgage bond issue and the sinking fund provided for

[1] See note at end of case.

therein, constitute a separate and distinct contract, wholly apart from that created by the other provisions of that instrument relating to traffic and other matters; that, while the latter are for the benefit of the Western Pacific and were fully submitted by the bill to this court, and are wholly within its jurisdiction to construe and adjudicate, it is not so with the former; that the interest and sinking fund provisions create rights which are solely for the benefit of the plaintiff as trustee and the bondholders whom it represents, and that, by a proper construction of those provisions, the trustee must be held vested with the independent right to enforce those provisions whensoever and wheresoever it may choose, and without interference by this court in any way; that this arises from the terms of the guaranty itself, which renders the obligation to pay interest and sinking fund nonassignable and not subject to sale, and the fund to be produced thereunder inviolate for the one purpose; and, further, that these provisions were specially excepted by the bill from the jurisdiction of this court by reserving the rights there given from the prayer for the sale of the other property.

This, in substance, fairly represents the attitude of the plaintiff. There are some minor contentions growing out of it which may be noticed as we proceed. There are several respects vital to this contention as to which I am satisfied it cannot be sustained.

In the first place, to say that the provisions of contract B involved in this contention may be construed separately and apart from the other provisions of that contract and as creating rights solely for the benefit of the trustee and bondholders is to ignore the history of that contract and what it was designed to accomplish. That purpose is to be gathered, not alone from the terms of contract B, but from the contemporaneous contracts A and C, and the deed of trust as well. They were all, as we have seen, executed at the same time, and constituted one transaction; and accordingly, in looking for the purpose sought to be accomplished, they must be construed together. When so construed, it will readily be perceived that the purpose was to carry out an enterprise conceived and intended primarily for the benefit and advantage of the contracting railroads, and that the protection and benefit of the bondholders was merely a means to the main end—to make the bonds of the defendant sufficiently attractive as an investment to induce their ready sale, by which to procure funds for carrying out the completion of the defendant's road. That this is so is plainly apparent from the recitals and provisions of those several instruments. Indeed, it is perhaps sufficiently apparent from the terms of contract B itself. But it is enough to say that, in looking for the consideration which moved the several parties to those contracts to their execution and the incorporation therein of the mutual covenants and obligations created by their terms, we are permitted, and indeed bound, to consider and construe them as a whole. When so construed, it is plain that they were intended to accomplish one main purpose, and the means adopted to that end, and what that end was, is to be gathered from the terms of all.

To say, then, that isolated provisions of this contract can be con-

strued separately and independently of the reciprocal covenants running to the Denver Company is to violate the most elementary principles of construction. Nor did those provisions create "independent rights," as 'that term has been used in argument, either in the trustee or the bondholders. As to the former, it is given such powers and duties as are ordinarily incident to the capacity in which it served, and those powers came to it solely by reason of its succession to the trusteeship under the mortgage. They were in no respect personal to the trustee, and vested no right in it as an individual. Nor are they free from the ordinary consequences which flow from proceedings to foreclose such instruments—that they are thereafter subject to the direction and control of the court.

.As to the rights of the bondholders under these provisions, it is not essential at this time, as above indicated, to definitely inquire, further than to answer the contention now presented. The question gives rise to some interesting considerations which may best be left until that contract comes up for construction with all the parties concerned before the court. The provisions for their protection were evidently intended to be of a character which would inspire the greatest degree of confidence in the security of the bonds as an investment, and hence the guaranty is made irrevocable until all and singular the bonds, principal, and interest, are fully paid; that is, until the obligation of each individual bond has been satisfied. But while these provisions are thus strong and intended so to be, so far as securing the payment of the obligations is concerned, they do not pretend to reserve in the bondholders nor in the trustees representing them, any right upon foreclosure to choose the tribunal or the party that shall enforce them. To the contrary, the contract expressly provides that all its provisions, including those under consideration, may be enforced, either by the trustee, or the Western Pacific, or by both; and, of course, any rights in that regard running to the defendant are now vested in its receivers.

It may be conceded that, under contract B, the trustee, prior to the foreclosure, could have proceeded independently against the Denver Company, and perhaps against the defendant as well, in any proper tribunal of its choice to compel a compliance with these provisions. But when it sought the aid of this court and brought its burden here, it surrendered any such liberty of action and subjected itself to the controlling hand of the court whose jurisdiction it thus invoked.

But assuming, even, that there is to be found in this contract warrant for the contention that the trustee has the right, notwithstanding the foreclosure proceedings, to independently enforce the particular provisions in question, having invested this court with the jurisdiction of the main controversy, any such ancillary action must be brought here. Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27, 28 L. Ed. 145. This is essential for the protection, not only of the jurisdiction of the court, but of the rights of the parties, from the possibility of costly and "unseemly conflicts between courts whose jurisdiction em-

braces the same subjects and persons." Farmers' Loan Co. v. R. R. Co., 177 U. S. 51, 20 Sup. Ct. 564, 44 L. Ed. 667.

Nor does it make any difference in this respect that the instrument upon which the dependent suit is based has not been physically surrendered to the receivers. It is in the hands of the plaintiff as trustee, and the latter is within the jurisdiction of the court. Farmers' Loan Co. v. R. R. Co., supra; Central Bank v. Stevens, 169 U. S. 432, 18 Sup. Ct. 403, 42 L. Ed. 807; Harkrader v. Wadley, 172 U. S. 148, 19 Sup. Ct. 119, 43 L. Ed. 399.

Enough has been said, I think, to show that plaintiff's contention, upon which it seeks to sustain its right to maintain the dependent action, cannot be upheld. But there is another and conclusive consideration against allowing it to proceed with that action. It is established from the principles above stated that the court of primary jurisdiction in a case of this impression is vested with full, complete, and exclusive jurisdiction to marshal the assets and pass upon all controversies arising from conflicting claims or liens thereon; and especially is this true as to any and all suits or proceedings which require anything in the nature of an accounting affecting those assets. It is equally obvious from what has been said that the rights sought to be enforced in the dependent suit cannot be had without a construction of contract B and an accounting thereunder as between the Denver Company and the defendant, and the dependent bill fully recognizes this necessity. While plaintiff's counsel has contended on this hearing that no accounting is necessary, but that a simple action at law would lie, and that the dependent bill in that respect proceeds upon an erroneous theory, I am satisfied that this view involves a clear misapprehension of the effect of that contract, and that the bill is founded upon a correct conception as to the form of action required. Moreover, the accounting there asked for and requisite to determine the rights of the parties will necessarily include, not only a right on the part of the Denver Company to an inquiry into any diverted earnings prior to the foreclosure, but a full accounting from the receivers of the earnings of the road while it has been under their control, since, as fully recognized by the dependent bill, the liability of the Denver Company under this contract is not absolute but contingent. This being so, it is clear, under the authorities, that the inquiry and relief there sought can only be had at the hands of this court.

It is obvious, I think, under the facts and principles above stated, that the Denver Company, by reason of its right and obligations under contract B, independently of any others it may hold, should have been originally made a party defendant to the bill in this court, and, not having been so made, that it should now be brought in, that the rights of the parties arising under the terms of that contract may be definitely determined by this court, with all parties in interest before it. For like reasons, the Missouri Pacific Railway Company should be made a defendant herein, and required to set up the rights claimed by it, if any, under the mortgage or under contract B. By the terms of contract C, that corporation is given a definite interest in at least some of the provisions of contract B, with a right to require specific perform-

ance thereof. This corporation should therefore be before the court when the effect of that contract is determined. As to the power of the court to bring in necessary parties and require them to interplead, notwithstanding they may be nonresidents of the district, I entertain no doubt. Compton v. Jesup, 68 Fed. 263, 15 C. C. A. 397, and authorities there cited.

As a result of these considerations, I am of opinion that the plaintiff should be definitely restrained from further proceeding with the present dependent bill, and from bringing any other action or proceeding involving contract B in any jurisdiction other than that of this court, or from taking any other step that might, in any wise, impair or affect the obligation of that contract or any of its provisions without first procuring the sanction of this court.

An order may accordingly be entered to that effect, and providing for the bringing in, as parties defendant to the bill, both the Denver & Rio Grande Railroad Company and the Missouri Pacific Railway Company, with the requirement that within 30 days from the date of the service upon them of such order, those corporations interplead herein and set up any and all rights they, or either of them, may have or claim against this defendant under the mortgage in suit, or any of the contracts pledged thereunder, or otherwise. The order may also provide for the granting of such further time to the receivers as may be deemed necessary for them for the purposes specified in their petition of May 18, 1915.

NOTE.—The provisions from contract B, referred to in the opinion, are as follows:

### Article II.

4. (a) The Denver Company and the Western Company, parties of the first part aforesaid, jointly and severally covenant and agree to purchase semi-annually, beginning with the date hereof except as otherwise expressly stated, and to pay therefor, dollar for dollar in cash, at the dates and in the manner hereinafter provided, promissory notes of the Pacific Company, bearing interest at the rate of five per cent. (5%) per annum and payable upon demand, to the amount face value, by which the gross earnings and income of the Pacific Company during the preceding fiscal half year shall be insufficient to meet the sum of the following:

(1) Its operating expenses, including rentals payable under leases and, particularly, any lease of terminals at Salt Lake City, also current payments upon claims for damages to persons or property, and its ordinary, including all necessary, expenses of maintenance;

(2) Its taxes, including all assessments and other governmental charges against it or that may become a lien upon any of its property;

(3) From and after the first day of September, 1908, or the earlier acquisition and completion of the Pacific Company's main line of railroad from San Francisco to Salt Lake City, all interest falling due during the then current calendar half year, upon the Pacific Company's fifty million dollars ($50,000,-000), face value, of first mortgage five per cent. thirty-year gold bonds;

(4) The Pacific Company's annual contribution to the sinking fund provided for in its said first mortgage, if the same be payable during the then current calendar half year;

(5) Any other charge or expense that it may be necessary that the Pacific Company shall pay, in order to assure the continued and efficient operation of its property and to protect unimpaired the lien and priority of its said first mortgage;

(6) Any tax or taxes which the Pacific Company may be required by law or permitted to pay upon or deduct from the principal or interest of its said

first mortgage bonds, so that the holders of such bonds shall, under all circumstances, receive the principal and interest thereof without deduction for any tax or taxes;

(7) All interest for such current calendar half year upon all indebtedness of the Pacific Company, other than its said first mortgage bonds.

Provided, however, that any payments made to the Trustee, as provided in paragraph (b) of this article, shall be deemed to constitute and shall be credited as payments of the purchase price of promissory notes of the Pacific Company to be purchased by the parties of the first part, pursuant to the foregoing terms of this paragraph (a).

(b) The Denver Company and the Western Company further jointly and severally covenant and agree semiannually, at the dates and in the manner hereinafter provided, out of the purchase price of the notes to be purchased by them as provided in paragraph (a) of this section, to pay unto the Trustee:

(1) From and after September 1, 1908, or the earlier acquisition and completion of the Pacific Company's main line of railroad from San Francisco to Salt Lake City, such amount as will, together with the amount actually and lawfully appropriated by the Pacific Company out of its earnings and other income and by it paid over to its fiscal agent in the city of New York (which may be the Trustee) or its fiscal agent in the city of San Francisco, or both of them, for the purpose of paying the interest to fall due during the then current calendar half year upon the Pacific Company's said first mortgage bonds upon which interest shall be payable, be sufficient to pay all such semiannual installments of interest;

(2) Such amount as will, together with the amount actually and lawfully appropriated by the Pacific Company out of its earnings and other income and by it paid over to the Trustee for the purpose of meeting the sinking fund payment, if any, required by said mortgage to be made by the Pacific Company during the then current calendar half year, be sufficient to meet such sinking fund payment.

(c) The parties of the first part will, on or before the 26th day of February in each year during which this agreement shall be in force, pay or cause to be paid to the Pacific Company or to whomsoever the same should be paid hereunder the amount required to be paid by them, as provided in clauses (1), (2), (5), (6), and (7) of paragraph (a) of this section, on account of the fiscal half year expiring on December 31st of the preceding year, and on or before the 29th day of August in each such year will pay or cause to be paid unto the Pacific Company or to whomsoever the same should be paid hereunder the amount required by said clauses of said paragraph (a) to be paid on account of the fiscal half year expiring on the 30th day of June, next preceding.

(d) The parties of the first part, on or before the 26th day of February and on or before the 29th day of August in each year, beginning with February, 1909, or with the February or August prior thereto next succeeding the acquisition and completion of the Pacific Company's main line of railroad from San Francisco to Salt Lake City, will pay to the Trustee under said first mortgage of the Pacific Company, the amount required to be paid by them pursuant to the provisions of paragraph (b) of this section, to supply, with the amounts then already paid by the Pacific Company to its said fiscal agents, or to either of them, the amount necessary to pay the semiannual interest upon the first mortgage bonds of said company to fall due upon the first day of the next succeeding month, and they will on or before the 29th day of August in each year, from and after and commencing with the year 1911, pay or cause to be paid unto said Trustee under said first mortgage such additional amount as will, together with the amount then already paid unto the Trustee by the Pacific Company, for that purpose, constitute and make up the full amount of the payment for the benefit of the sinking fund to be made by the Pacific Company for the then current year in accordance with the terms of its said first mortgage.

All amounts paid or payable to the Trustee under this agreement for the purpose of providing for the payment of interest shall constitute a trust fund for the payment of interest due or thereafter to become due upon the Pacific Company's first mortgage bonds and shall be by the Trustee made available at the fiscal agencies of the Pacific Company as hereinafter provided, but

only for the payment of interest upon said bonds then due or thereafter to fall due as the same shall mature and payment thereof shall be demanded. Neither the Pacific Company nor any one claiming under it, save only such persons or corporations as may be entitled to receive the interest upon said first mortgage bonds, shall be entitled to or possess any interest in, lien upon or claim to said fund, or any part thereof.

(e) The Denver Company and the Western Company, parties of the first part aforesaid, hereby waive, and each of them hereby waives, any right which they or either of them might otherwise have to demand the delivery of any of the promissory notes to be purchased by them as provided in paragraph (a) of this section before or coincidently with the payment by them of the purchase price of any such notes as provided in paragraphs (a), (b), (c) and (d), of this section, and the said parties of the first part and each of them will promptly pay the purchase price of all notes that they or either of them shall be under obligation to take hereunder at the times and in the manner herein provided, although the Pacific Company shall not at the time of any such payment have ready for delivery or shall not have taken the steps necessary to authorize the delivery of, or for any other reason shall fail to deliver, any of such promissory notes; but neither of the parties of the first part shall be deemed by reason of the making of any payment prior to the receipt of the notes thereby paid for or by reason of anything in this paragraph contained, to have waived or otherwise prejudiced the right of said parties or either of them to receive or to enforce the delivery by the Pacific Company of such or any notes that the parties of the first part or either of them shall pay for or shall have paid for hereunder.

(f) The parties of the first part further, jointly and severally, covenant and agree that in case the Pacific Company, at any time when by the terms of this agreement the parties of the first part are under obligation to purchase from it any promissory note or notes, shall not be authorized to issue such note or notes by reason of the fact that its capital stock, outstanding and subscribed, shall not be sufficient in amount to authorize the issuance by the Pacific Company of such note or notes, the parties of the first part, or one of them, will subscribe for an amount of the unissued capital stock of the Pacific Company sufficient to render the issuance of such note or notes of the Pacific Company authorized and lawful.

5. The parties of the first part further jointly and severally covenant and agree that they will pay or cause to be paid, otherwise than by the Pacific Company, any tax or taxes that the Pacific Company may be required by law or permitted to pay upon or to deduct from the principal or interest of any of its first mortgage bonds, as such tax or taxes shall become due or payable, except such tax or taxes as the mortgage securing said bonds shall lawfully require the Pacific Company itself to pay, but nothing contained in this paragraph shall require the parties of the first part, or either of them, to pay any such tax so long as the validity thereof shall, in good faith, be contested by the Pacific Company or by any one in its behalf; but in case of any such contest, the parties of the first part jointly and severally agree, if required so to do by the Trustee, to pay or cause to be paid to the Trustee, the amount of the tax or taxes that the Pacific Company shall be so required to pay or deduct; and the amount so paid shall constitute a trust fund in the hands of the Trustee, and shall by it be held and applied to the sole purpose of discharging said taxes in case the same shall eventually be decided to be payable, and, in case said taxes, or any part thereof, shall eventually be decided not to be payable, shall be returned, to the extent that such taxes shall have been annulled, to the party or parties that shall have paid the same to the Trustee.

### Article III.

\* \* \* \* \* \* \* \* \* \*

4. The Pacific Company will, simultaneously with the payment by the parties of the first part, or either of them, of any amount required to be paid by them by the terms of section 4, of article II hereof, execute and deliver to the party of the first part making such payment its promissory note or notes bearing interest from the date thereof at the rate of five per cent. (5%) per

annum and payable upon demand, in an amount in the aggregate equal to the amount of such payment, and in case it shall be impossible for any reason for the Pacific Company at the date of the making of any such payment to execute and deliver valid promissory notes as above provided, it will execute and deliver such note or notes as soon thereafter as the same shall be legally possible, and the Pacific Company expressly covenants and agrees that it will, in ample season to permit the execution and delivery of said notes as the same shall be required, take any and every corporate action that shall be required to give validity thereto.

5. The Pacific Company, party of the second part, hereby covenants and agrees that it will faithfully apply all of its gross earnings and income, as the same shall accrue, to the following purposes and in the following order of priority:

(1) To the payment of its operating expenses, including rentals under leases and, particularly, any lease of terminals at Salt Lake City, also claims for damage to persons or property, and its ordinary, including all necessary, expenses of maintenance, except amounts due to the parties of the first part, or either of them on account of advances made under this agreement.

(2) To the payment of its taxes, assessments and other governmental charges against it or that may become a lien upon any of its property.

(3) To the payment of all interest as it shall accrue from time to time upon the Pacific Company's fifty million dollars ($50,000,000), face value, of first mortgage five per cent. thirty-year gold bonds, from and after the first day of September, 1908, or the earlier acquisition and completion of the Pacific Company's main line of railroad from San Francisco to Salt Lake City.

(4) To the payment of the Pacific Company's annual contribution to the sinking fund provided for in its said first mortgage.

(5) To the payment of any other charge or expense that the Pacific Company may be obliged to pay, in order to assure the continued and efficient operation of its property and to protect unimpaired the lien thereon of its said first mortgage.

(6) In so far as it may lawfully agree to pay and may lawfully pay the same, to the payment of any tax or taxes which the Pacific Company may be required by law or permitted to pay upon or deduct from the principal or interest of its said first mortgage bonds, so that the holders of such bonds shall receive the principal and interest thereof without deduction for any tax or taxes.

(7) To the payment of all interest that shall have accrued upon any other indebtedness of the Pacific Company.

(8) To the payment pro rata to the parties of the first part of the amounts due to them, respectively, upon the promissory notes held by them and received under the provisions of section 4, of article II hereof, and of all amounts that they or either of them shall have paid to the Pacific Company or the trustee pursuant to the provisions of said section, notes wherefor shall have been demanded but shall not have been delivered; but, except as provided in section 5 of article II hereof with respect of taxes contested and annulled, nothing herein contained shall require the Pacific Company or any one to repay to the parties of the first part, or either of them, any moneys that they or either of them shall have paid on account of any tax or taxes that the Pacific Company shall have been required by law or permitted to pay upon or deduct from the principal or interest of its said first mortgage bonds, unless by the terms of the Pacific Company's said first mortgage the Pacific Company, itself, shall be lawfully required to pay such tax or taxes.

6. The Pacific Company further expressly covenants and agrees that it will, not later than the 20th day of February and not later than the 23d day of August in each year, commencing with February, 1909, or with the February or August prior thereto next succeeding the acquisition and completion of the Pacific Company's main line of railroad from San Francisco to Salt Lake City, actually pay over to its fiscal agents in the city of New York and the city of San Francisco, or to one of them, the amount to be paid by it for the purpose of paying the installment of interest to fall due upon the first day of the following month upon its said first mortgage bonds, and that it will not thereafter permit any of the funds so paid over to be used for any purpose other

than the payment of such installment of interest, and that it will cause the fiscal agents or fiscal agent to which such payment shall be made forthwith to notify the Trustee of the making of such payment and of the amount thereof and likewise to permit the Trustee, or any representative of the trustee, to examine all the books and accounts of each of said fiscal agents so far as the same concern any such payment or the payment or nonpayment of any interest upon any of said first mortgage bonds, and will likewise cause said fiscal agents or fiscal agent forthwith to notify the auditor acting as provided in section 6, article VI hereof, both by letter and telegram, of such payment and of the amount thereof.

The Pacific Company further expressly covenants and agrees that it will, not later than the 23d day of August in each year, commencing with the year 1911, actually pay over to the Trustee the amount to be paid by it for the purpose of making the sinking fund payment to fall due during the year expiring upon the last day of the then current month, as required by the Pacific Company's said first mortgage.

7. The Pacific Company further agrees that as soon as and whenever the gross earnings of the Pacific Company yield a surplus above the expenses and charges enumerated in paragraphs (1) to (7) of section 5 of this article, all traffic balances due to the Pacific Company accruing in the hands of either of the parties of the first part may be by such party applied in payment and discharge pro tanto of the claims of such party of the first part on account of payments (subject to repayment) made by it pursuant to the provisions of article II hereof or otherwise, and such party of the first part may apply such balances to the discharge of claims upon open accounts or upon promissory notes of the Pacific Company, or of both classes of claims, as it may elect.

## Article V.

The Trustee hereby covenants and agrees that it will hold all moneys received by it pursuant to the provisions of this instrument in trust for, and will apply the same or cause the same to be applied at the times and in the manner herein provided to the uses and purposes herein prescribed with respect of such moneys, or, in the absence of any provision hereof with reference to the application of any such moneys, to the uses and purposes provided with respect thereof in said first mortgage of the Pacific Company; and that it will, from time to time, upon the request of any holder or holders of bonds secured by said first mortgage of the Pacific Company and being satisfactorily indemnified against the expense of so doing, acting either alone or with the Pacific Company, take steps to enforce by a suit or suits in equity or at law or by other proper proceedings to be prosecuted or taken in its own name or in the name of the Pacific Company, or in the name of both, all the terms and provisions of article II hereof that require any payments to be made to the Trustee by the parties of the first part or either of them, and, upon the request of the holder or holders of twenty per cent. (20%) in amount of said bonds at the time being outstanding, will likewise enforce any and all other provisions of this agreement, and likewise of all modified agreements, if any, substituted therefor, as provided in section 14 of article I hereof.

## Article VI.

\*  .  \*   \*     \*     \*     \*     \*     \*     \*     \*.

10. The refusal, neglect or other failure of the Pacific Company to perform any or all of the covenants, agreements or conditions herein contained by it to be performed shall not constitute ground for the rescission of or refusal to perform or delay in performing this contract by the parties of the first part, or either of them; but in event of any such refusal, neglect or other failure, the party or parties of the first part aggrieved thereby may have resort to such remedy by suit for specific performance or action for damages as may be appropriate. But nothing herein contained shall be taken to authorize any action that shall have the effect of impairing in any manner or to any extent the lien or security of the first mortgage of the Pacific Company, or of preventing, obstructing or interfering with the exercise of any of the remedies thereby granted to the Trustee. Time is strictly of the essence of each and all

the covenants and agreements to be performed by the parties of the first part, or either of them, and contained in sections 4 and 5 of article II hereof.

*      *      *      *      *      *      *      *      *      *

13. This agreement shall, except as hereinafter provided, continue in full force and effect, and be binding upon all the parties hereto, from the date hereof until all of said $50,000,000, face value, of first mortgage five per cent. thirty-year gold bonds of the Pacific Company shall be fully paid, principal and interest, or until said bonds shall be called for redemption and provision made for payment thereof in full, principal and interest, as provided in the first mortgage of the Pacific Company, and shall run with the railways of the said several railway companies, parties thereto, into whosoever hands the same may come; and this agreement and the provisions thereof shall be so construed that any person or persons, corporation or corporations, which may at any time acquire in any manner any of the said several railways of the parties hereto shall be held and be deemed to have expressly agreed by virtue of the act or acts, deed or deeds, or other instrument or transaction by or through which the said person or persons, corporation or corporations, may immediately or indirectly have acquired the said several railways, or any thereof, to and with each and every of the parties hereto to observe and perform all of the terms required by this agreement to be performed or to be observed by the party hereto from whom, immediately or indirectly, the said person or persons, corporation or corporations, may have acquired the said railways or railway, and the said person or persons, corporation or corporations, shall be held to be bound by an express contract with the parties hereto and by and upon an express trust to perform and observe as aforesaid all the terms hereof, including all acts and things that may be necessary to preserve in full force the several obligations and agreements herein established or contained for the full term hereof; and the obligations and provisions of this agreement shall be deemed to be part of the consideration of any contract or contracts, of whatever form or nature the same may be, and of any other transaction by which any person or persons, corporation or corporations, may acquire or undertake to acquire the said several railways or any of them. Each of said railway companies parties hereto further covenants and agrees with all the other parties hereto that if it shall at any time during the continuance of this agreement, by lease, sale, consolidation or otherwise, convey or in any manner transfer its property or its rights and franchises in or to all or any of the premises affected hereby, then any instrument containing or setting out any such lease, sale, consolidation or other conveyance, shall contain a covenant that the same is made subject to all the provisions of this instrument, and that its lessee, grantee, successor or other transferee, as the case may be, and any and every person or corporation claiming under any such lessee, grantee, successor or other transferee, shall, by the acceptance of such instrument and by the acceptance of such lease, grant, consolidation or other conveyance, become bound to perform and observe all of the terms hereby required to be performed or observed by the party making such lease, grant, consolidation or other conveyance, including all acts and things that may be necessary to preserve in full force the several obligations and agreements herein established or contained for the full term hereof.

14. Notwithstanding anything herein contained or anything contained in said first mortgage of the Pacific Company, neither the obligation of the parties of the first part nor the obligation of either of them to make any of the payments provided for in paragraphs 4 and 5 of article II of this agreement, as and at the times herein provided, shall be abrogated or in any manner modified until all of the bonds secured by the Pacific Company's first mortgage shall be fully paid, principal and interest, or until said bonds shall be called for redemption and provision made for payment thereof in full, principal and interest, as provided for in the first mortgage of the Pacific Company, and this agreement shall not, prior to such time, be abrogated or modified as to any other provision or in any other respect in any manner, nor shall the rights of any of the parties hereunder be changed in any other respect (save after default by the Pacific Company as hereinafter provided), except by written agreement whereto the Trustee shall be a party and which shall have been approved in writing by the holders of outstanding bonds, being two-thirds in amount of the bonds authorized to be issued under the Pacific Company's first mortgage,

such writing being executed and authenticated in substantially the manner provided in section 15 of article five of said mortgage; but any of the provisions of this agreement, save those contained in paragraphs 4 and 5, of article II hereof, and such provisions as may be supplementary thereto, may be abrogated or modified by a written agreement between all the parties hereto, including the Trustee, provided the same shall have been approved in writing by the holders of the amount of said bonds aforesaid, such writing being executed and authenticated in the manner aforesaid. In case the Pacific Company, or any of its successors or assigns, shall make default in the due payment of the principal of or interest agreed to be paid upon its bonds to be issued under its said first mortgage, according to the tenor and effect of said bonds and the interest coupons pertaining thereto, or in event of any default in the covenants or conditions of said first mortgage whereby a right of foreclosure shall thereunder accrue to the Trustee or the holders of the bonds secured thereby, the Trustee shall have and shall forthwith become vested with the right, upon the written request of the holders of two-thirds in amount of the bonds outstanding and secured by said mortgage executed and authenticated in the manner aforesaid, to, and upon any such request, the Trustee shall terminate this agreement, save and excepting always the provisions for payments in interest, sinking fund contributions and taxes contained in paragraphs 4 and 5 of article II hereof, and, as well, any and all other agreements, if any there shall be, to which the railway companies parties hereto, or either thereof, or any of their successors or assigns, are parties, whereby the parties of the first part, or either of them, or any of their successors or assigns, shall or may have or claim to have any rights in or to the use or possession of any of the lines of railway or of the property or franchises or income of the Pacific Company, by a notice in writing to that effect, addressed and mailed to the Denver Company and to the Western Company at Denver, Colorado, and to the Pacific Company at San Francisco, California; and upon the expiration of thirty (30) days from and after the mailing of such notice this agreement and all other agreements such as aforesaid, anything herein or therein or in said first mortgage to the contrary notwithstanding, shall terminate except as aforesaid, and all rights of the parties of the first part, their successors or assigns, or either or any of them, to possession of any of the lines of railway or of the property, franchises or income of the Pacific Company shall thereupon cease; but such termination of this agreement shall not be deemed to and shall not release, nor shall anything else done hereunder release, the rights of the Trustee or of the holders of the first mortgage bonds of the Pacific Company to the benefits of the agreements of the Railway Companies, parties of the first part, to make the payments provided for in paragraphs 4 and 5 of article II hereof, or upon or against any fund derived or constituted as provided in any of said paragraphs. Nothing herein contained shall be taken to authorize or to result in the termination of this agreement in any event or contingency (prior to the payment or provision for payment of all of said first mortgage bonds, principal and interest, as aforesaid), except upon the election of the Trustee made with the written approval of the holders of two-thirds in amount of the outstanding bonds secured by the Pacific Company's first mortgage given and evidenced in manner and form as above provided; but, on the contrary, at all times prior to such termination thereof, whether before or after default as aforesaid, the Trustee as well as the Pacific Company, its successors and assigns, shall be entitled to specific performance of the same and of any agreement substituted therefor and to enforce the same by suits in equity or actions at law or otherwise, as may be appropriate.