# RICHTER *v.* JEROME.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MICHIGAN.

Argued October 20, 1887. — Decided November 7, 1887.

If the trustee in a deed of trust in the nature of a mortgage acts in good faith in foreclosing it, and obtains a decree of foreclosure and sale, whatever binds the trustee in the proceedings which are begun and carried on to enforce the trust, binds the *cestuis que trust* as if they were actual parties to the suit.

If, in a suit in equity by the trustee in a deed of trust in the nature of a mortgage to foreclose the mortgage the decree or the sale is obtained in fraud of the rights of the *cestuis que trust*, their remedy is a direct proceeding to set aside the sale or the decree and proceed anew with another foreclosure; and not an attempt to reforeclose what had been fully foreclosed before, under a decree which remains in force.

On the facts alleged in the complainant's bill and set forth in the opinion of the court: *Held*, that the complainant is not entitled to the relief prayed for in his bill, and that the decree of foreclosure obtained by the corporation trustee, under the mortgage of which he is a *cestui que trust*, binds him.

THIS was a suit in equity brought by Morris Richter, the appellant, and the case made by the bill and its exhibits was in substance this :

In 1864 the Portage Lake and Lake Superior Ship-Canal Company was organized as a corporation under the laws of Michigan to build a ship-canal from the most westerly point of Portage Lake through a neck of land, called " The Portage," to Lake Superior. In 1865 · and 1866 Congress made two grants of land to the State of Michigan, of 200,000 acres each, to aid in this work, and both these grants were tranferred by the State to the canal company. The company · afterwards executed three mortgages on the lands so granted, .to secure bonds amounting in all to $2,000,000.

On the 3d of March, 1863, Congress granted the State other lands, containing in the aggregate 220,000 acres and upwards, to aid in building a military road, called in the pleadings a " wagon road," from Fort Wilkinson, Copper Harbor, Michigan, to Fort Howard, Green Bay, Wisconsin. By the terms of this grant thirty sections could be sold at once, and thereafter thirty sections as each ten miles of road was completed. If the road was not completed in five years no further sales could be made, and the unsold lands were to revert to the United States. 12 Stat. 798, c. 104, § 3. On the 6th of May, 1870, this time was extended until January 1, 1872. 16 Stat. 121, c. 93.

In 1868, Francis W. Anthony contracted with the State to build the road, and in consideration thereof was to receive " all · the benefits, emoluments, rights and interests arising from " the land-grant. He was to have at once the first thirty sections authorized to be sold, and as any continuous ten miles (afterwards changed to two miles) was completed he was " entitled to apply for and receive a certificate for the number of sections granted to aid in the construction " thereof. In August, 1870, thirty miles of the road had been completed, and $47,958\frac{85}{100}$ acres of land were conveyed to him therefor in fee.

In November, 1870, as is alleged in the bill, about eighty miles of the road had been completed, and 153,000 acres of land earned, including that which had been patented, but

Anthony had exhausted his financial resources and credit, and was in debt to the amount of $30,000. Being in this condition he went to New York to get money. While there, as is alleged, he entered into a verbal arrangement with the stockholders and directors of the canal company to raise the necessary funds to complete both the canal and the road, by which he was to transfer to Perez J. Avery, Alfred Wild, J. Edwin Conant, and William L. Avery all his rights under the road contract, including the $47,958\frac{85}{100}$ acres patented lands; the canal company was to change its name to the Lake Superior Ship-Canal, Railroad and Iron Company; the directors of the canal company, as individuals, were to subscribe $2,000,000 to its capital stock, and pay their subscription by their warranty deed of 200,000 acres of the road lands; and thereupon the canal company was to issue bonds to the amount of $3,500,000, secured by a mortgage to the Union Trust Company of New York, "to raise money for the Portage Lake Canal enterprise and for the wagon-road enterprise."

On the 25th of April, 1871, Anthony entered into a contract with Perez J. Avery, Alfred Wild, J. Edwin Conant, and William L. Avery, by which he agreed to sell to them, and they agreed to buy from him, all the wagon-road lands at seventy-five cents an acre, to be paid for as follows :

"Thirty-six thousand ($36,000) dollars within thirty days from this date.

"Eight thousand ($8000) dollars by the fifth day of June.

"Eight thousand ($8000) dollars by the fifth day of July.

"Eight thousand ($8000) dollars by the fifth day of August.

"Eight thousand ($8000) dollars by the fifth day of September.

"Eight thousand ($8000) dollars by the fifth day of October.

"Eight thousand ($8000) dollars by the fifth day of November; all in the year 1871, and the balance in three payments; one of one-quarter of the whole amount, in six months from November first, 1871; and one of like amount, payable on the first of November, 1872; and the other of one-half the whole amount, payable on the first day of November, 1873; the last three payments to be secured by the joint and several notes of

the parties of the second part, with the bonds of the Lake Superior Ship-Canal Railroad and Iron Company, at sixty per cent, assigned as collateral to said notes."

The contract of Anthony for building the road was transferred by him to the purchasers, " with all the rights, privileges, powers, and claims arising from the same," and he agreed to convey all the lands for which he then held patents as soon as the $36,000 were paid. The lands which had been earned and not patented, amounting, with those patented, to 150,000 acres, " more or less," were to be conveyed as soon as title should be obtained, and Anthony was to go on and complete the road and convey the remainder of the lands as fast as they were earned and he got title thereto. Upon the execution of a deed for the lands which had already been earned, but not then patented, the purchasers were to assign to Anthony, as security for the six monthly payments of $8000 each, $72,000, at par, of the bonds of the canal company, he agreeing to surrender $12,000 of them as each monthly payment of $8000 was made. Upon the conveyance of the lands which had not then been earned, but which were to be earned by the completion of the road, the purchasers were to execute notes for the price, in accordance with the terms of their agreement, and secure them with the bonds of the canal company, at 60 per cent on the face value of such bonds.

On the first of May, 1871, Perez J. Avery, Alfred Wild, and J. Edwin Conant, three out of the four purchasers of the lands from Anthony under this contract, executed a deed to the canal company, in which, after reciting that they were the owners in fee of 220,000 acres of land granted to the State of Michigan to build the road, and had subscribed for five hundred shares of the capital stock of the company, to be paid for by a conveyance of 200,000 acres of such land, they did, in consideration of the stock, convey to the company in fee simple, with full covenants of warranty, " all and singular those two hundred and twenty thousand acres of land, being the same granted by act of Congress of the United States, entitled ' An act granting lands to the States of Michigan and Wisconsin, to aid in the construction of a military road from Fort

Wilkinson, Copper Harbor, Keweenaw County, in the State of Michigan, to Fort Howard, Green Bay, in the State of Wisconsin,' approved March 3d, 1863; which said lands are fully described and designated on the maps and record books of the office of the register of the land office at Marquette, Michigan, and to which records and maps reference is hereby made for a fuller and more perfect description of said lands, saving and reserving from the operation of this deed twenty thousand acres of land, to be selected by taking the sections reserved in their order as they come, commencing at the Wisconsin state line, and taking the sections on both sides of said road far enough north to get twenty thousand acres of land."

On the same day that this deed was delivered, the company executed to the Union Trust Company of New York a deed of trust covering the two land grants to the canal company, "and also two hundred thousand acres of land situate, lying, and being in said State of Michigan, subscribed to the capital stock of the party of the first part, and fully and particularly described in a full covenant deed made by Perez J. Avery, Alfred Wild, and J. Edwin Conant, and their wives, dated on the first day of May, A.D. 1871, conveying said last-mentioned two hundred thousand acres of land" to secure a proposed issue of bonds to the amount of $3,500,000. Of this amount of bonds $1,300,000 were issued by the trustee to the directors of the canal company with the usual certificate of security thereon. The bill then alleged that the directors of the canal company and Anthony, upon the faith and credit of these bonds, raised in open market $36,000, in money, which was paid over to Anthony on his contract for the sale of the lands, and afterwards $16,000 more which was used in the same way. The remainder of the $1,300,000 "were sold or pledged in the open market of New York, and elsewhere, and money raised thereupon and applied to the use and benefit of said Lake Superior Ship-Canal Railroad and Iron Company."

On the 25th of May, 1872, a bill was filed against the canal company for the foreclosure of its mortgage on the lands embraced in the first Congressional grant, and on the 3d of July, 1872, for the foreclosure of that on the lands in the sec-

ond grant. On the 5th of July, 1872, another bill was filed for the foreclosure of the third mortgage executed by the company, which covered all the lands in both grants. Then, on the 19th of June, 1875, the Union Trust Company filed its bill to foreclose the mortgage which was executed to that company May 1, 1871, and covered both the land grants and the 200,000 acres embraced in the conveyance of Avery, Wild, and Conant. The same solicitor appeared for the plaintiff in each of the several foreclosure suits. On the 27th of August, 1872, the canal company was declared a bankrupt, and thereafter George Jerome and Fernando C. Beaman, its assignees, became parties to the litigation.

In the bill filed by the Union Trust Company for the foreclosure of its mortgage, the issue of the $1,300,000 of bonds was set out, and the following allegations made in respect to the " wagon-road lands," so called:

"That of the 200,000 acres mortgaged to the complainant, in addition to said 400,000 acre land grants, it is claimed that said company has no title, save to $47,958\frac{85}{100}$ acres, and that the title to the remainder has been patented to other parties. Complainant annexes hereto a list of said last named lands, to wit, of said $47,958\frac{85}{100}$ acres, marked Exhibit 'C.' Complainant is informed and believes that said lands are worth about $3.00 per acre, or about $150,000 ; that said lands are known as the ' wagon-road lands,' and were acquired from the State of Michigan by one Francis W. Anthony, and were conveyed to said bankrupt company mortgagee. Exhibit 'C' is a copy of the list on file in the office of the Secretary of State of Michigan, being certificate of purchase No. 1 of military road land under act No. 20 of the laws of 1864, approved February 4th. That March 4th, 1873, Henry S. Wells, a bondholder secured by complainant's said mortgage, filed his bill in this court, impleading, among others, said Francis W. Anthony, said assignees, and this complainant, and sought by said bill to subject the said ' wagon-road lands,' other than said $47,958\frac{85}{100}$ acres, to the lien of complainant's mortgage, and to prevent their conveyance by the State to third parties, and afterwards such proceedings were had that the relief sought was denied.

That in article ten of a cross-bill, filed by said assignees in this court September 13th, 1873, said assignees state that certain stockholders of said bankrupt had contracted to buy lands to the amount of 200,000 acres, parcel of a larger amount granted by the State of Michigan for the construction of a military wagon-road, and, assuming to be owners, had conveyed the same to the said bankrupt; that said grantors had acquired title to only about 49,000 acres, and only about that amount became vested in said bankrupt, and that the residue had been patented by the State of Michigan to other parties and lost to said corporation, and that said assignees made the same statement substantially in their answer to a bill by this complainant to foreclose said mortgage in the said district court, which bill was discontinued."

The prayer, so far as it related to the road lands, was, "that said $47,958\frac{85}{100}$ acres of land known as 'wagon-road lands' may also be sold; and that all the estate, right, title, and interest of the defendants in the rest and residue of said 200,000 acres of wagon-road lands may be sold," and the proceeds applied to the payment of the outstanding bonds. The decree, which was entered March 13, 1877, established the lien of the Union Trust Company mortgage on the $47,958\frac{85}{100}$ acres of wagon-road lands to which the canal company had title, and, as to the rest, found as follows: "That the title to the remainder of said wagon-road lands passed from the State of Michigan to third parties, so that, as to the same, the said Union Trust mortgage covers only a possible equity, which equity in the residue of said 200,000 acres of wagon-road lands, is also a security for said 1300 bonds." It was then ordered, among other things, that "the equity of redemption or other right or interest of said mortgagor corporation in the residue of said wagon-road lands" be sold with the other mortgaged property, including the $47,958\frac{85}{100}$ acres, to pay the bonds.

Under this decree the mortgaged property was sold in June or July of 1877 to Albon P. Man and Nathaniel Wilson, and this sale confirmed in due course of practice. Soon afterwards, Man and Wilson released to James C. Ayer, then in life, but since deceased, the right to or equity of redemption in all the

200,000 acres of wagon lands which had not been actually conveyed to Anthony, and by him to the purchasers from him, and by them to the canal company.

The present bill was filed on the 12th of July, 1882, by Morris Richter, as "the holder, as purchaser in good faith," of two hundred and thirty of the thirteen hundred bonds secured by the Union Trust Company mortgage, against the Union Trust Company, the assignees in bankruptcy of the canal company, and the widow, heirs, devisees, and trustees under the will of Ayer, then deceased. Richter had received on each of his bonds from the master the sum of nine dollars as his share of the proceeds of the Union Trust Company foreclosure. No other payment of principal or interest had ever been made. The bill charged in substance that Theodore M. Davis, receiver of the Ocean National Bank, being the holder of 910 of the various issues of the bonds of the canal company as security for a debt of the company to the bank of about fifty per cent of the-face-of the bonds, J. Boorman Johnston & Co. holding 200 of one of the issues of bonds as security for a debt of the company of about eighty per cent of the amount of the bonds, and James C. Ayer & Co., of which James C. Ayer was the principal proprietor, holding 760 of the various issues of bonds as security for a debt of the company of about fifty per cent of the amount of the bonds, formed a syndicate at the instance of Davis, and "agreed to pool their bonds and debts aforesaid for the common interest of said syndicate, and to run down the value of said bonds upon the market, and to wreck the enterprise aforesaid." By the fraud and connivance of the members of this syndicate, as is alleged, "the legal title to the whole of said pledged bonds was procured," before May 27, 1872, "at a mere fraction of their face value." This being done, the syndicate, on the 27th of May, 1872, caused proceedings to be commenced for the foreclosure of the first of the land-grant mortgages, and on the 3d of July, 1872, similar proceedings for the foreclosure of the second of that class of mortgages, and on the 5th of the same month for the third. The bill then alleged that before these suits were begun the directors of the canal company had proceeded so far with

negotiations for raising money for their enterprise that "a successful conclusion was assured on a basis of satisfactory title of said 600,000 acres of land being found in said . . . canal company, and on the value of said property being verified as represented by report of agents for that purpose, who had been delegated by foreign capitalists to investigate to that end, of which promised success, the said syndicate having been advised, they, the said members of said syndicate, set themselves about thwarting the success of said negotiations, and accomplished their purpose" by buying over Anthony from his allegiance to the canal company under his contract with the Averys, Wild, and Conant, furnishing the money necessary to complete the wagon-road contract, and getting the title to the unpatented lands in Ayer. This scheme was accomplished, and lands amounting in the aggregate to something more than 173,000 acres were conveyed to Ayer — 153,000 acres in 1873, and the remainder in 1875. To induce Anthony to come into the scheme he was paid a bonus of $20,000 by Ayer, and furnished the money necessary to complete his contract for building the road. The date of this transaction does not appear, except, generally, that it was in 1872. This, as was alleged, prevented the canal company from raising money, and the syndicate, with the intent to secure to Ayer the title to the "residue of said wagon-road lands," enlisted the said Union Trust Company of New York in their designs, and procured the said Union Trust Company . . . to allow . . . Alfred Russell, the solicitor of the said syndicate, upon the retainer of said syndicate, to foreclose the said Union Trust mortgage in the interest of said syndicate, but with the understanding that such foreclosure should be conducted . . . for the protection of the aforesaid legal title to the said residue of said wagon-road lands in the said James C. Ayer, as far as practicable and possible under the decree to be obtained therein."

The bill then alleged in substance that the suit for foreclosure was begun and carried on for this purpose among others, and that Ayer got the mortgage title to the residue of the lands under the decree in that way and pursuant to that under-

standing. And finally it was alleged that the decree rendered in the cases under which the title was got "was not, in fact, an adjudication of the said court upon consideration of the pleadings and proofs in the said several causes which, as appears by said decree, were heard and decided together, but was, in fact, a decree drawn by the said Alfred Russell, solicitor of the syndicate aforesaid, and submitted to by compulsion by those representing collateral interests therein, and assented to by the Union Trust Company of New York aforesaid in collusion with the syndicate aforesaid through their solicitor aforesaid, and by the said George Jerome and Fernando C. Beaman, assignees in bankruptcy of said ship-canal company aforesaid, through ignorance of the rights and equities of the said last-mentioned corporation against the legal title of the said James C. Ayer to the said residue of the said wagon-road lands beyond the 47,000 and odd acres which were actually sold under said decree; and said Jerome and Beaman were actually misled as to the lien of the said Union Trust mortgage upon said residue of said wagon-road lands by the collusion, neglect, and failure of the said Union Trust Company, in its foreclosure bill aforesaid, to make said James C. Ayer a party defendant, charging the legal title to said lands in his hands with a trust for the payment of said mortgage, and by the collusive concession in said foreclosure bill that the title to said residue of said wagon-road lands had been lost to the said ship canal company and taken out from under the lien of said mortgage by reason of a grant thereof to third parties by the State of Michigan, whereby the lien of said mortgage had been lost, and hence the said Jerome and Beaman, seeing no interest which they could conserve by opposing said decree as drawn, and insisted on by said Russell, consented to said decree as proposed by said Russell, and said decree was entered accordingly by consent as aforesaid, and so it was represented to the judge who allowed the same to be entered without opposition or argument or consideration, and it was signed accordingly.

The prayer of the bill was "that your orator may be allowed by this court to have the benefit of said decree herein set forth as 'Schedule D,' hereto, in behalf of your orator, and any other

holders of said 1300 bonds secured by the said mortgage to the said Union Trust Company of New York, who are *bona fide* holders of said bonds in said decree mentioned, and that in behalf of your orator and said bondholders the said residue of 200,000 acres of wagon-road lands so deeded to said James C. Ayer in his lifetime, as heretofore stated, may be by the decree of this court charged in the hands of said widow and heirs, or of said trustees, with a trust for the payment of the unpaid portion of said 1300 bonds and interest thereon, and that the said residue of said land be sold under the decree and direction of this court to pay the moneys remaining due upon said unpaid bonds, or so much thereof as shall be necessary to that end; subject, however, to the lien of the said widow and heirs, or of said trustees under the will of the said James C. Ayer, for all money advanced by said James C. Ayer in completion of said wagon-road land contract, as the same shall be ascertained upon an accounting of the same, with interest, as the same shall appear upon an accounting thereof."

The Union Trust Company failed to appear, and as to it the bill was taken *pro confesso*. The other defendants demurred to the bill, and upon hearing the demurrer was sustained, and the bill dismissed. From a decree to that effect this appeal was taken.

*Mr. Don M. Dickinson* (with whom were *Mr. J. P. Whittemore* and *Mr. John S. Seymour* on the brief) for appellant cited : *Koehler* v. *Black River Falls Iron Co.,* 2 Black, 715 ; *Penn* v. *Baltimore,* 1 Ves. Sen. 444 ; *Massie* v. *Watts,* 6 Cranch, 148 ; *Van Ness* v. *Hyatt,* 13 Pet. 294 ; *Hart* v. *Sansom,* 110 U. S. 151 ; *Gay* v. *Parpart,* 106 U. S. 679 ; *Morsell* v. *First National Bank,* 91 U. S. 357 ; *Freedman's Saving & Trust Co.* v. *Earle,* 110 U. S. 710 ; *Cunningham* v. *Macon & Brunswick Railroad,* 109 U. S. 446 ; *Sheldon* v. *Fortescue,* 3 P. Wms. 104 ; *Kennedy* v. *Daly,* 1 Sch. & Lefroy, 355 ; *Saunders* v. *Dehew,* 2 Vernon, 271.

*Mr. Walter D. Davidge* and *Mr. James Lowndes* for appellees cited : *Morgan* v. *Morgan,* 2 Wheat. 290 ; *Symmes* v. *Guthrie,*

9 Cranch 19; *Mallow* v. *Hinde*, 12 Wheat. 193; *Findlay* v. *Hinde*, 1 Pet. 241; *Willard* v. *Tayloe*, 8 Wall. 557; *Marble Company* v. *Ripley*, 10 Wall. 339; *Brashier* v. *Gratz*, 6 Wheat. 528; *Pratt* v. *Carroll*, 8 Cranch, 471; *Colson* v. *Thompson*, 2 Wheat. 336; *Dorsey* v. *Packwood*, 12 How. 126; *Boone* v. *Missouri Iron Co.*, 17 How. 340; *Holt* v. *Rogers*, 8 Pet. 420; *Graham* v. *Railroad Co.*, 102 U. S. 148; *Mitchell* v. *Homfray*, 8 Q. B. D. 587; *Sanger* v. *Upton*, 91 U. S. 56; *People's Bank* v. *National Bank*, 101 U. S. 181; *McQuiddy* v. *Ware*, 20 Wall. 14; *Badger* v. *Badger*, 2 Wall. 87; *Harwood* v. *Railroad Company*, 17 Wall. 78; *Grymes* v. *Sanders*, 93 U. S. 55; *McKnight* v. *Taylor*, 1 How. 161.

*Mr. E. W. Meddaugh* filed a brief for the appellees Ayer, citing: *Bryan* v. *Kennett*, 113 U. S. 179; *Hornsby* v. *The United States*, 10 Wall. 224; *Soulard* v. *United States*, 4 Pet. 511; *Wing* v. *McDowell*, Walker's Ch. (Mich.) 175; *Freedman's Saving & Trust Co.* v. *Earle*, 110 U. S. 710; *Campbell* v. *Railroad Co.*, 1 Woods, 368; *Shaw* v. *Norfolk County Railroad Co.*, 5 Gray, 162; *Richards* v. *Chesapeake & Ohio Railroad*, 1 Hughes, 28; *Bank* v. *Hopkins*, 2 Dana, 395; *Dunn* v. *Pipes*, 20 La. Ann. 276; *Fletcher* v. *Holmes*, 25 Ind. 458; *Chamberlain* v. *Preble*, 11 Allen, 370; *Derby* v. *Jacques*, 1 Clifford, 425; *Holmes* v. *Rogers*, 13 Cal. 191; *Gifford* v. *Thorn*, 1 Stockton (9 N. J. Eq.) 720, 722; *Edgerton* v. *Muse*, 2 Hill (S. C. Eq.), 51; *Brown* v. *Sprague*, 5 Denio, 545; *Nashville, &c., Railway Co.* v. *United States*, 113 U. S. 226; *Kropholler* v. *St. Paul, &c., Railroad Co.*, 2 Fed. Rep. 302; *S. C.* 1 McCrary, 300; *Sahlgard* v. *Kennedy*, 13 Fed. Rep. 242; *Groustra* v. *Bourges*, 141 Mass. 7; *Miller* v. *Rutland & Washington Railroad*, 36 Vt. 452; *Sturges* v. *Knapp*, 31 Vt. 1; *Denniston* v. *Coquillard*, 5 McLean, 253; *Boone* v. *Missouri Iron Co.*, 17 How. 340; *Marble Co.* v. *Ripley*, 10 Wall. 339; *Bank of Columbia* v. *Hagner*, 1 Pet. 454; *Colson* v. *Thompson*, 2 Wheat. 336; *Thompson* v. *Bruen*, 46 Ill. 125; *Russell* v. *Nester*, 46 Mich. 290; *Jones* v. *Lynds*, 7 Paige, 301; *Frazier* v. *Broadnax*, 2 Little, 249; *Harwood* v. *Railroad Co.*, 17 Wall. 78; *Gordon* v.

*Ross*, 63 Ala. 363; *Evans* v. *Bacon*, 99 Mass. 213; *Embury* v. *Klemm*, 3 Stewart (30 N. J. Eq.), 517; *Spaulding* v. *Farwell*, 70 Maine, 17; *Royal Bank of Liverpool* v. *Grand Junction Railroad*, 125 Mass. 490; *Campau* v. *Van Dyke*, 15 Mich. 371; *Plymouth* v. *Russell Mills*, 7 Allen, 438; *Marsh* v. *Whitmore*, 21 Wall. 178; *Godden* v. *Kimmel*, 99 U. S. 201; *Credit Co.* v. *Arkansas Cent. Railroad*, 15 Fed. Rep. 46; *McVicker* v. *Filer*, 31 Mich. 304; *Smith* v. *Davidson*, 40 Mich. 632; *Sullivan* v. *Portland & Kennebec Railroad*, 94 U. S. 806; *Corcoran* v. *Chesapeake & Ohio Canal Co.*, 94 U. S. 741; *Shaw* v. *Railroad Co.*, 100 U. S. 605; *Glenny* v. *Langdon*, 98 U. S. 20; *Trimble* v. *Woodhead*, 102 U. S. 647; *Phelps* v. *McDonald*, 99 U. S. 298; *Hodgson* v. *Sidney*, L. R. 1 Ex. 313; *Brobst* v. *Brock*, 10 Wall. 519; *Gilbert* v. *Cooley*, Walker's Ch. (Mich.) 494; *Trimble* v. *Woodhead*, 102 U. S. 650; *Dial* v. *Reynolds*, 96 U. S. 340; *Chamberlain* v. *Lyell*, 3 Mich. 448; *Eagle Fire Co.* v. *Lent*, 6 Paige, 635; *Banks* v. *Walker*, 3 Barb. Ch. 438; *Jones* v. *St. John*, 4 Sandf. Ch. 208; *Bogey* v. *Shute*, 4 Jones Eq. (Nor. Car.) 174; *Peters* v. *Bowman*, 98 U. S. 56; *San Francisco* v. *Lawton*, 18 Cal. 465; *S. C.* 79 Am. Dec. 187; *Merchants' Bank* v. *Thomson*, 55 N. Y. 7; *Banning* v. *Bradford*, 21 Minn. 308; *Pelton* v. *Farmin*, 18 Wis. 222; *Summers* v. *Bromley*, 28 Mich. 125; *Graham* v. *Railroad Co.*, 102 U. S. 148; *Brush* v. *Sweet*, 38 Mich. 574; *De Hoghton* v. *Money*, L. R. 2 Ch. App. 164; *Hill* v. *Boyle*, L. R. 4 Eq. 260.

Mr. Chief Justice Waite, after stating the case, delivered the opinion of the court.

We are unable to find any authority for granting the relief which is sought in this case. The bill was not filed to set aside the decree in the suit brought by the Union Trust Company to foreclose its mortgage. On the contrary, the complainant asks in express terms to have the benefit of that decree, so that, as we suppose, he may keep the money he has got as his share of the proceeds of the sale under it. Neither is it sought to hold the Union Trust Company accountable for its alleged misconduct and breach of faith in the proceedings for the fore-

closure of the mortgage. Nor is the suit brought to obtain a specific performance of the contract between Anthony and the Averys, Wild, and Conant, nor to recover back the money paid by the canal company on that contract over and above what was necessary to pay for the lands which had been patented to Anthony, and which were actually sold under the Union Trust Company decree for the benefit of the complainant and the other bondholders.

But it is, if we understand it correctly, a suit to charge the wagon-road lands, now in the hands of the legal representatives of Ayer, with a trust in favor of bondholders as security for the amount due them respectively, subject only to a lien for the moneys actually advanced to enable Anthony to complete his contract for building the road and thus become entitled to patents.

There can be no doubt but the mortgage by the canal company conveyed to the Union Trust Company, as trustee for the bondholders, all the interest in the lands which was conveyed to the canal company by the warranty deed of Perez J. Avery, Wild, and Conant; but that was no more than the interests which those grantors acquired by the contract with Anthony. As their deed was with covenants of warranty, any title which they afterwards acquired under the Anthony contract would enure to the benefit of the bondholders through the Trust Company as their trustee holding for their benefit, and as their representative. All the rights the bondholders have or ever had in the mortgage, legal or equitable, they got through the Trust Company, to which the conveyance was made for their security. As bondholders claiming under the mortgage, they can have no interest in the security except that which the trustee holds and represents. If the trustee acts in good faith, whatever binds it in any legal proceedings it begins and carries on to enforce the trust, to which they are not actual parties, binds them. *Kerrison* v. *Stewart*, 93 U. S. 155, 160; *Corcoran* v. *Chesapeake, &c., Canal Co.*, 94 U. S. 741, 745; *Shaw* v. *Railroad Co.*, 100 U. S. 605, 611. Whatever forecloses the trustee, in the absence of fraud or bad faith, forecloses them. This is the undoubted rule.

Here the Trust Company began its suit for the foreclosure of its mortgage, and has sold under the decree in that suit all the interests, legal and equitable, which it held in the land as trustee for the bondholders, and distributed the proceeds, the complainant receiving his share without complaint and without objection. All the rights which the Trust Company, as trustee, had in the lands at the time of the mortgage passed to the purchaser at the sale. That sale, it is conceded, binds the Trust Company as trustee and therefore it binds the complainant as a bondholder. If the decree or the sale under it was in fraud of the rights of the bondholders, their remedy is by a direct proceeding to set aside the sale or the decree, and to proceed anew with another foreclosure of the mortgage, and not to undertake to reforeclose what had been fully foreclosed before under a decree which remains in force.

But it is said that the original foreclosure was of no effect, because neither Anthony nor Ayer was a party to the suit, and the rights of the Trust Company and its beneficiaries under the mortgage were neither set forth with certainty in the bill nor found in the decree. No relief was sought either against Anthony or Ayer. The sole purpose of the bill was to sell the interest of the mortgagee in the lands, whatever that interest might be. To a suit for that purpose neither Anthony nor Ayer was a necessary party, because it was not important to them who held the rights that were to be sold, and such a sale would not affect them. The canal company, or its assignees in bankruptcy, were parties to the suit, and instead of objecting, as they might, to a sale of the property without a more specific adjudication as to what was to be sold, consented to it. The bondholders were represented in the suit by their trustee, and are bound by the decree so long as it stands unreversed, and is not set aside or vacated.

The argument of counsel for the appellants seems to proceed on the ground that there are two equities growing out of the mortgage to the Trust Company, which may be dealt with in two separate suits as they are separate and distinct in their character. One he calls the mortgagor's equity, consisting of the rights of the canal company in the lands growing out of

the contract by Anthony for their sale to the Averys, Wild, and Conant. This equity, if we understand counsel correctly, it is conceded was sold under the proceedings for foreclosure, and now belongs to the purchaser. The other he denominates the "bondholders' equity," and it arises out of the purchase by Ayer from Anthony of his rights under the contract with the State of Michigan for building the wagon road when he (Ayer) had knowledge of the former contract under which the canal company could have perfected its title to the unpatented lands included in the mortgage if he had not interfered. Under this equity counsel say they now seek to recover for the bondholders "only the profits which Ayer made by stepping into Anthony's shoes in the premises."

We are unable to see how these two equities, if there are two, can be separated in the way contemplated. They both grow out of the canal company's rights under the contract between Anthony, and the Averys, Wild, and Conant. If the canal company could not recover from Ayer, neither the bondholders nor their trustee in the mortgage can. The title upon which their right of recovery rests, if such a right ever existed at all, was in the Trust Company, as the trustee of their security, at the time the original foreclosure was had, and it was part of the mortgagor's equity which was sold. It was then what this bill seeks to make it now, part of the security of the bondholders under the Trust Company mortgage, and being such it passed with the rest to the purchaser at that sale.

Something is also said in the argument about the equitable claims of the bondholders upon Ayer as the successor of Anthony, growing out of the false representations made to them as to the title of the lands covered by the mortgage when they paid the money and took their bonds; but all such claims come from the mortgage, as to which, in all proceedings for foreclosure, they are represented by their trustee when its interests are not in conflict with theirs. All the equities now asserted were proper subjects for adjudication in the former suit if they existed. They formed part and parcel of the security which was then enforced, and, not being excepted from the sale, passed by it.

This makes it unnecessary to consider whether there was such fraud on the part of Anthony as to charge the lands in the hands of Ayer, even if the Trust Company were now proceeding against him under the mortgage.

The decree is

*Affirmed.*