## PALMER v. BANKERS' TRUST CO. et al. (two cases).

(Circuit Court of Appeals, Eighth Circuit. May 5, 1926.)

Nos. 7084, 7085.

**1. Railroads ⊜⇒186—Bondholder's right to intervene in suits to foreclose railroad mortgage held properly heard on record and affidavits.**

Questions of bondholder's right to intervene in suits to foreclose railroad mortgages

securing bonds, and of advisability of permitting him to do so, were properly heard on record, including affidavits.

**2. Courts ⊜⇒343—Right of intervention is not absolute, but court must exercise its sound legal discretion in each case (new equity rule 37).**

Under new equity rule 37, right of intervention is not absolute and unqualified, but court is required to exercise its sound legal judgment in each case.

**3. Railroads ⊜⇒186—Bondholders may not intervene in suit to foreclose railroad mortgage, unless trustee represents interest opposed to bondholders, or is not acting in good faith.**

Trustee under railroad mortgage, being party to suit to foreclose mortgage, represents all bondholders, and such bondholders will not be permitted to intervene, in absence of showing that trustee represents financial interest opposed to bondholders, is conspiring to bring about unfair results, is guilty of fraud, or is not acting in good faith.

**4. Railroads ⊜⇒186—Railroad mortgage trustee's acts for bondholders' committee held not to show disqualification giving bondholder right to intervene.**

In suits to foreclose railroad mortgages, wherein plan for reorganization was approved by bondholders' committees, fact that corporate trustee under mortgage was depositary of bonds represented by a bondholders' committee, and that trustee's vice president was secretary of such committee, held not to show disqualification or unfairness of trustee, as respected right of bondholder to intervene.

**5. Mortgages ⊜⇒290—Doctrine of sale in inverse order of alienation could not be applied, where neither corporate stock involved nor persons affected were within court's jurisdiction.**

In suit to foreclose railroad mortgages, if stock in another corporation was not covered by mortgage, but was covered by another mortgage, doctrine of resort to property in inverse order of alienation could not be applied in connection with the other mortgage, where neither the stock, the owner of equity in the stock, nor the trustee under the other mortgage, were within court's jurisdiction, and no default had been made in such other mortgage.

**6. Railroads ⊜⇒30—Railroad mortgage trustee's approval of reorganization plan held not indicative of bad faith, where plan was approved by committees representing 84 per cent. of bondholders.**

Where committees representing owners of 84 per cent. of bonds secured by railroad mortgages had approved plan of reorganization, and plan had been approved by parties to other litigation and District Court, held, that approval of plan by trustee under mortgages did not indicate its bad faith; it being its duty to obey request of such bondholders.

**7. Railroads ⊜⇒30—Equity court will not aid minority bondholder to hold up fair reorganization plan, to obtain more favorable terms for his bonds than are given others.**

Though court of equity will not allow minority bondholders to be unfairly treated in a

reorganization plan, it will not aid minority bondholder in holding up fair reorganization plan solely to obtain greater value or more favorable terms for his bonds than are to be given by plan to majority of bondholders especially if he has bought his bonds pending reorganization for purpose of speculating thereon, and such bondholder, seeking aid of court of equity, must show fully his status.

8. **Railroads** ⚷192.

In suit to foreclose railroad mortgage, it is discretionary with court, but quite common, to fix upset price.

9. **Railroads ⚷192—Evidence held to show that upset price fixed in railroad mortgage foreclosure was not too low, and that trustee's acquiescence therein showed neither bad faith nor bad judgment.**

In suits to foreclose railroad mortgages, evidence *held* to show that upset price of $17,-935,700, fixed by court, was not too low, and that trustee's acquiescence therein did not show either bad faith or bad judgment.

10. **Appeal and error ⚷87(3)—Orders denying bondholder permission to intervene in suits to foreclose railroad mortgage held not appealable.**

Where facts and circumstances made it discretionary with court whether to allow or refuse to permit bondholder to intervene in suits to foreclose railroad mortgages, orders denying intervention were not appealable.

Appeal from the District Court of the United States for the District of Colorado; John Foster Symes, Judge.

Consolidated mortgage foreclosure suits by the Bankers' Trust Company against the Denver & Rio Grande Railroad Company and the Denver & Rio Grande Western Railroad Company. From orders denying petitions of Harold Palmer for leave to intervene therein, petitioner appeals. Affirmed.

Louis B. Wehle, of New York City (Mason A. Lewis and James B. Grant, both of Denver, Colo., on the brief), for appellant.

Henry McAllister, Jr., of Denver, Colo., for appellee Denver & Rio Grande Western R. Co.

Roberts Walker, of New York City (William V. Hodges, of Denver, Colo., Joseph M. Hartfield, of New York City, and James Grafton Rogers, of Denver, Colo., on the brief), for appellee Bankers' Trust Co.

Cravath, Henderson & De Gersdorff, Murray, Aldrich & Roberts, John F. Bowie, and Donald C. Swatland, all of New York City, for appellees Swatland and Hibberd.

Before STONE, KENYON, and BOOTH, Circuit Judges.

BOOTH, Circuit Judge. Review is sought by these two appeals, respectively, of two orders which denied two petitions of appellant for intervention in the suit entitled "Bankers' Trust Company, as Trustee, Plaintiff, v. Denver & Rio Grande Railroad Company and Denver & Rio Grande Western Railroad Company, in equity, No. 7381, Consolidated Cause." There is also a motion to dismiss the appeals, on the ground that the orders were not appealable. The consolidated suit represents another chapter in the long history of the complicated litigation involving the Denver & Rio Grande Railroad Company and its subsidiary and affiliated companies. The history can be found in Equitable Trust Co. v. Western P. R. Co. (D. C.) 231 F. 478; Id., 231 F. 571, 145 C. C. A. 457; Id., 233 F. 335; Id. (D. C.) 236 F. 814; Id. (D. C.) 244 F. 485; Id., 250 F. 327, 162 C. C. A. 397; Denver & Rio Grande R. Co. v. Equitable Trust Co., 246 U. S. 672, 38 S. Ct. 423, 62 L. Ed. 932; Equitable Trust Co. v. Denver & R. G. R. Co. (D. C.) 269 F. 987; Levy v. Equitable Trust Co. (C. C. A.) 271 F. 49; Beers v. Equitable Trust Co. (C. C. A.) 286 F. 878, 883, and 886.

A rehearsal of a few facts from that history is necessary to a proper understanding of the present appeals:

On or about August 1, 1908, the Denver & Rio Grande Railroad Company (hereafter called the old Denver Company), made, executed, and delivered to the Bankers' Trust Company of New York, as trustee, its first and refunding mortgage (hereafter called refunding mortgage) to secure an authorized issue of bonds, not to exceed in the aggregate the principal sum of $150,000,000, of which bonds approximately $42,000,000 of principal amount were issued. The mortgage covered in general the railways, franchises, property rights, and income of the railroad company. August 1, 1921, the old Denver Company defaulted in the payment of an installment of the sinking fund provided for in the refunding mortgage and due on that date, and also defaulted in the payment of interest due under the mortgage on the same date. It further defaulted in the payment of interest due February 1, 1922. On July 21, 1922, the trustee filed its bill in the court below, and on August 21, 1922, its supplemental bill, to foreclose the mortgage.

Among the property owned by the old Denver Company at the time of the execution of the refunding mortgage were 100,000 shares of stock in the Utah Fuel Company. Whether this stock was covered by the refunding mortgage is a question which has

caused trouble and litigation, but which does not require answer in this case. The salient facts in regard to the stock are as follows:

In 1901, the Rio Grande Western Railway Company, one of the predecessors of the old Denver Company, bought the stock of the Utah Fuel Company, paying for it in bonds under its first consolidated mortgage (hereafter called consolidated mortgage) in the principal amount of $6,000,000. The stock was pledged with the Guaranty Trust Company of New York, trustee under said consolidated mortgage. The equity in this stock thereafter became the property of the old Denver Company, and in December, 1917, was attached by the Equitable Trust Company in a suit brought by it in the Supreme Court of the state of New York upon a judgment theretofore obtained against the old Denver Company in the United States District Court for the Southern District of New York in the sum of upwards of $36,000,000. June 20, 1918, this equity was sold on execution under judgment of the state court for $4,000,000 to William Salomon & Co., who assigned and transferred it to the Western Pacific Railroad Corporation February 14, 1919. It was claimed by the Bankers' Trust Company, trustee under the refunding mortgage, that the equity in this stock was covered by that mortgage, subject, of course, to the consolidated mortgage. The Western Pacific Railroad Corporation thereafter filed a bill in the United States District Court for the Southern District of New York, in the nature of a bill to quiet title to the stock, making the Bankers' Trust Company and others defendants in the suit. Issue was joined, and the suit brought to trial, but before decree the proceedings were suspended by stipulation, subject to being revived upon 10 days' notice. This was the situation when the present foreclosure suit was commenced.

On or about May 1, 1912, the old Denver Company made, executed, and delivered to the New York Trust Company, as trustee, its so-called adjustment mortgage, to secure an issue of bonds not to exceed in the aggregate the principal sum of $25,000,000, of which $10,000,000 were issued. This mortgage covered in general the same property that was covered by the refunding mortgage. The railroad company defaulted in the payment of interest on the adjustment mortgage June 30, 1921, December 31, 1921, and June 30, 1922. On July 7, 1922, the trustee filed its bill to foreclose the mortgage.

These two foreclosure suits were consolidated by order of court July 21, 1922. A receiver was appointed, who took possession the same day. He found in possession the Denver & Rio Grande Western Railroad Company (hereafter called the new Denver Company), a corporation which had been formed for taking possession of and operating the railways after the sale thereof which had been made in the creditor's bill suit on November 20, 1920. See Levy v. Equitable Trust Co. of N. Y. (C. C. A.) 271 F. 49, 54. The new Denver Company had taken possession August 1, 1921. The new Denver Company was in possession, not only of the railways, but also of other property necessary to the operation of the railways, but not covered by the refunding mortgage or the adjustment mortgage. The receiver appointed in the present suit, however, took possession of this property also, pursuant to an agreement with the new Denver Company to make adjustment therefor later.

On November 20, 1922, the special master who had been appointed in the case made his report on the receiver's budget for improvements and betterments. The report showed that the road would need for betterments and additions during the succeeding three years $22,000,000; that the service of the road was from 15 to 25 per cent. short of adequacy on the main line, and worse on branch lines; that $7,000,000 should be made available within 60 days, and $3,000,000 more before the end of 1923; and this in addition to prospective earnings which might be applicable for the same purposes. $5,000,000 of equipment trust certificates and $5,000,000 of receiver's certificates were recommended. New equipment was needed, especially in the way of additional power, also new shop equipment, ballasting, restoration of bridges. A receiver's report was attached to the report of the special master, showing, among other things, that the annual interest on the underlying bonds was $3,279,740. The receiver's estimate for additions and betterments needed was $21,129,644.

On December 2, 1922, the court approved the report of the special master and ordered the issuance of $5,000,000 receiver's equipment trust certificates. A subsequent order fixed the amount at $4,500,000. The court further ordered the issuance of $5,000,000, receiver's certificates. At this time the refunding bonds, which were in foreclosure, were being quoted on the market at from 45¾ to 49. It may be here stated that in January, 1924, the court authorized a further issue of receiver's certificates in the principal amount of $1,500,000, with which to raise

money to pay interest on the underlying bonds.

A plan of reorganization had been under discussion for several years. On June 15, 1923, a proposed plan, approved by three committees of bondholders, was published. It provided briefly as follows: That the property covered by the refunding and adjustment mortgages in foreclosure should be sold, and be acquired by a new company (it was later found feasible to make use of the new Denver Company); that the new company should issue to the refunding bondholders and the adjustment bondholders, in exchange for their bonds, general mortgage bonds secured by mortgage on the properties of the new company, and also preferred stock; that the exchange should be on the basis of $725 general mortgage bonds and $400 par value preferred stock for each $1,000 refunding or adjustment bonds. It was estimated that the amount of general mortgage bonds necessary would be $29,808,000 and the amount of preferred stock would be $16,445,600.

The plan further provided that the new company should issue $150,000,000 of refunding and improvement bonds, to be secured by a mortgage covering all of the railroad properties and equipment of the new company, prior in lien to the general mortgage, but subject to the underlying mortgages. All of these refunding and improvement bonds (except about $3,000,000, which were to be issued immediately to provide the new company with additional working capital) were to be reserved and issued solely to refund the underlying bonds, or for additions and betterments on the property.

The plan further provided that the Western Pacific Railroad Corporation, which owned the stock of the new Denver Company, should turn over to the new company $10,000,000 in cash and other assets valued at about $8,000,000; that the Western Pacific Railroad Corporation should also subject the Utah Fuel stock (subject to the lien of the consolidated mortgage) to a trust agreement, under which the dividends on the stock should be turned over to the new company unconditionally until February 1, 1929, and thereafter so long as necessary to pay the interest on the general mortgage bonds and dividends on the preferred stock, which were to be issued by the new company to the refunding and the adjustment bondholders in exchange for their bonds; that the ultimate beneficial interest of the Utah Fuel stock should be in the Western Pacific Railroad Corporation and the Missouri Pacific Railroad Company;

that the new company should issue 300,000 shares of common stock to the Western Pacific Railroad Corporation, which in turn should sell one-half thereof to the Missouri Pacific Railroad Company for $9,000,000, which was the amount estimated to be equal to one-half the value of the cash and other assets turned over by the Western Pacific Railroad Corporation to the new company. The plan made no provision for purchase' or exchange of the stock of the new Denver Company, then owner of the properties covered by the two mortgages in foreclosure.

The plan further provided that, unless the consent and approval of such public authorities as might be necessary should be obtained by December 31, 1923, the plan should be considered abandoned, unless the time should be extended by consent of a majority of the chairmen of the bondholders committees and various other interested parties. Owners of refunding or adjustment bonds were allowed to deposit their bonds up to August 1, 1923, and participate in the plan. This period was extended until the expiration of 90 days from the date of entry of final decree, which was September 18, 1924.

It is thus seen that the plan of reorganization had among its objects: (1) Provision for funds with which to take up the receiver's certificates, amounting to $6,500,000, due in December, 1924, and for other present financial requirements. (2) Conversion of the refunding bonds and adjustment bonds into new general mortgage bonds and preferred stock. (3) Provision for taking care of the underlying bonds and financing future improvements. (4) Early termination of the receivership. The plan, after being given wide publicity for a year, was finally declared operative June 18, 1924.

On August 2, 1924, appellant Palmer filed his petition for intervention. This petition, when stripped of much extraneous and argumentative matter, is found to contain allegations in substance as follows: That the petitioner is the owner of $182,000 of refunding bonds, and represents $200,000 more; that he had demanded of the trustee under the refunding mortgage that the decree of sale in the consolidated foreclosure suit should provide for an upset price sufficient in amount to yield the full amount of principal and interest of the refunding bonds; that the trustee had refused to comply with this demand; that the petitioner desired to intervene for the purpose of praying the court that the decree provide for an upset price of not less than $42,883,875 over and above all

costs, expenses, fees, and allowances; that this sum would be sufficient to pay the bonds in foreclosure, principal and interest; that the Bankers' Trust Company, trustee, could not represent the petitioner because of its interest, course of action, conduct, and policy as to the properties and affairs of the old Denver and new Denver Companies; that the Bankers' Trust Company, as trustee, was co-operating with the Hammond committee of bondholders, who were interested in bringing about the adoption of the reorganization plan; that the proposed reorganization plan was unfair and inequitable to the refunding bondholders, yet the trustee was acquiescing therein; that the earnings of the railroad under the receivership had shown such "recuperative vitality" as to demonstrate that no reorganization was necessary; that, unless an upset price at the figure above named was provided in the decree, the sale of the properties should be postponed until the court in which the foreclosure suit was pending should determine the question whether the Utah Fuel stock was covered by the refunding mortgage, subject, first, to the consolidated mortgage; and if the court should determine that question in the negative, then that the sale should be further postponed, and the court should apply to the Utah Fuel stock the doctrines of "marshaling of assets" and of "resort to property in the inverse order of alienation" as between the refunding mortgage and the consolidated mortgage; and, if necessary to facilitate such application, that the receiver should be directed to cause a default under the consolidated mortgage, in order to bring about a foreclosure thereof.

[1] The petition for intervention was verified, and was accompanied by a supplemental affidavit. Opposing affidavits were also filed. The questions of the right of the petitioner to intervene, and of the advisability of permitting him so to do, were heard upon the record in the cause, including the affidavits pro and con. We think that this was proper practice. Beaton v. Seaboard Portland Cement Co., 211 F. 84, 127 C. C. A. 508; Investment Registry v. Chicago, etc., Co. (D. C.) 213 F. 492, 497. The court, after full hearing, denied the petition.

In denying this first petition for intervention, the court said that the only new question raised by the petition was as to the upset price; that the other questions raised had been previously passed upon by the court. The court further stated that petitioner would be allowed to be heard on the question of the upset price.

The second petition for intervention was filed November 12, 1924, and had for its purpose to oppose confirmation of the foreclosure sale which had been made October 29, 1924, and to ask for vacation of the foreclosure decree which had been entered September 18, 1924. It set forth as grounds for such relief substantially the same facts and reasons as had been stated in the first petition. During the interim between the two petitions, additional interest on the underlying mortgages had fallen due October 1, 1924, and the court had ordered the receiver not to pay this, inasmuch as it had not been earned. Another installment of interest would fall due December 1, 1924. The court had already by its order of July 1, 1924, directed the receiver not to pay the interest due on that date, inasmuch as it had not been earned. The court denied the second petition for intervention. Appeals were taken from both orders denying intervention.

At the time when the first petition for intervention was filed, August 2, 1924, the refunding bonds were being quoted in the market at from 43¼ to 45. The interest on the underlying bonds amounted to $3,279,740 per annum. The total interest charges during the first six months of 1924 were $2,758,363. The income available during that period for the payment of interest was $1,456,395. For the year 1923 the total interest charges had amounted to $5,071,855. The income available for interest had amounted to $2,860,463. There was owing to the new Denver Company for cash and materials taken over by the receiver, which were not covered by the two mortgages in foreclosure, upwards of $5,000,000. There were outstanding $4,200,000 equipment trust certificates and $6,500,000 receiver's certificates. These latter would mature December 1, 1924. There was due under the refunding mortgage in foreclosure more than $44,000,000, and under the adjustment mortgage in foreclosure more than $12,000,000. The plan of reorganization had been published more than a year, and had received wide publicity. Three committees of bondholders were favorable to the plan. Eighty-four per cent. of the refunding bonds and 98 per cent. of the adjustment bonds were in favor of it. The plan had been presented to the Interstate Commerce Commission, had been modified to meet certain objections, and had received the approval of that body. The Interstate Commerce Commission had also approved the necessary steps to be taken by the new company in the issuance of bonds and stock, and the assumption of mort-

gages, and had also approved the acquirement of one-half of the common stock of the new company by the Missouri Pacific Company. Denver & Rio Grande Western Reorganization, 82 Interst. Com. Com'n R. 745; Id., 90 Interst. Com. Com'n R. 141; Acquisition by Missouri Pac. of D. & R. G. W. Common Stock, 90 Interst. Com. Com'n R. 161. The foreclosure was nearly completed, the final decree had been drafted, and counsel for the appellant was present and took part in the conference with the court respecting the form of the decree. It was in view of such situation that the court denied the petition.

[2] Intervention in the federal court is governed by new equity rule 37, which provides in that regard as follows: "Any one claiming an interest in the litigation may at any time be permitted to assert his right by intervention, but the intervention shall be in subordination to, and in recognition of, the propriety of the main proceeding." It is plain, from the language used, that strictly speaking the rule does not recognize an absolute and unqualified right of intervention. There are two qualifications specifically mentioned in the rule itself. Further, the words "may * * * be permitted to assert his right by intervention" clearly indicate that in some instances intervention may be denied. In each case the court is called upon to exercise its sound legal judgment. In some cases the facts and circumstances may be such that to deny the intervention would be error on the part of the chancellor; for example, where the petitioner, not being already fairly represented in the litigation, is asserting a right which would be lost or substantially affected if it could not be asserted at that time and in that form. In such cases the right of intervention if often termed absolute. Credits Commutation Co. v. United States, 177 U. S. 311, 20 S. Ct. 636, 44 L. Ed. 782; Minot v. Mastin (C. C. A. 8) 95 F. 734, 37 C. C. A. 234; United States v. Philips (C. C. A. 8), 107 F. 824, 46 C. C. A. 660; U. S. Trust Co. v. Chicago Terminal Transfer Ry. Co., 188 F. 292, 110 C. C. A. 270; United States v. Carter, 192 F. 311, 112 C. C. A. 569; Central Trust Co. v. C., R. I. & P. R. Co., 218 F. 336, 134 C. C. A. 144; Western Union Tel. Co. v. U. S. & M. Trust Co. (C. C. A. 8) 221 F. 545, 137 C. C. A. 113; Vicksburg, etc., Ry. Co. v. Schaff (C. C. A.) 5 F.(2d) 610. In other cases, the facts and circumstances may be such that the court is clearly justified in denying intervention. The mere matter of delay alone is often a decisive factor with the court. First Nat. Bank v. Shedd,

121 U. S. 74, 86, 7 S. Ct. 807, 30 L. Ed. 877; Central Trust Co. v. C., H. & D. R. Co. (C. C.) 169 F. 466, 472.

[3] One familiar class of cases in which intervention is frequently denied is corporate mortgage foreclosure cases. The general rule in such cases is that the trustee, being a party to the suit, represents all the bondholders, and that the latter will not be permitted to intervene unless a showing is made that the trustee is not unexceptionable; for example, that the trustee has or is representing a financial interest in the litigation opposed to that of the bondholders, that the trustee is conspiring with someone to bring about unfair results, and that the trustee is guilty of fraud or is not acting in good faith. Shaw v. Railroad Co., 100 U. S. 605, 611, 612, 25 L. Ed. 757; Richter v. Jerome, 123 U. S. 233, 246, 8 S. Ct. 106, 31 L. Ed. 132; Skiddy v. Railroad Co., Fed. Cas. No. 12,922 pages 286, 287; Farmers' Loan & Trust Co. v. Kansas City, etc., R. Co. (C. C.) 53 F. 182; Clyde v. Railroad Company (C. C.) 55 F. 445, 448; Bowling Green Co. v. Virginia Co. (C. C.) 132 F. 921, 924; Continental, etc., Bank v. Allis-Chalmers Co. (D. C.) 200 F. 600, 609.

The petitioner in the instant case recognized these principles, and in his petitions and accompanying affidavits sought to make the necessary showing against the Bankers' Trust Company, the trustee under one of the mortgages being foreclosed. Furthermore, the refunding mortgage provided:

"Section 20. No holder of any refunding bond or coupons shall have any right to institute any suit, action or proceedings in equity or at law for the foreclosure of this indenture, or for the execution of any trust hereunder, or for the appointment of a receiver, or for any other remedy hereunder, unless such holder previously shall have given to the trustee written notice of such default and of the continuance thereof, as hereinbefore provided, nor unless also the holders of 25 per cent. in amount of the refunding bonds then outstanding shall have made written request upon the trustee, and shall have afforded to it a reasonable opportunity either to proceed to exercise the powers hereinbefore granted, or to institute such action, suit or proceedings in its own name; nor unless, also, they shall have offered to the trustee adequate security and indemnity against the costs, expenses and liabilities to be incurred therein or thereby; and such notification, request and offer of indemnity are hereby declared in every such case, at the option of the trustee, to be conditions precedent to the execution of the powers and trusts of this in-

denture and to any action or cause of action for foreclosure or for the appointment of a receiver or for any other remedy hereunder; it being understood and intended that no one or more holders of bonds and coupons shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the lien of this indenture, or to enforce any right hereunder, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of all holders of such outstanding bonds and coupons."

This provision of the mortgage does not, however, override the principles above stated, but must be read in connection therewith. Three matters were specially relied upon by petitioner: (1) The relation of the trustee to the Hammond committee, which was formed for the purpose of looking after the interests of the refunding bondholders under the reorganization plan. (2) The action of the trustee in respect to the Utah Fuel stock. (3) Acquiescence by the trustee in the reorganization plan, especially in respect to the disposition of the Utah Fuel stock and in respect to the upset price to be fixed by the decree.

[4] 1. *The Trustee and the Bondholders' Committees.* The trustee was depositary for the bonds represented by the Hammond committee. A vice president of the trustee was secretary of the committee. There is nothing in these facts, however, showing disqualification or unfairness of the trustee. Fidelity Trust Co. v. Washington-Oregon Corporation (D. C.) 217 F. 588, 602. The trustee was not representing bondholders under different mortgages with conflicting interests. It was charged by petitioner that the trust company and the Hammond committee had acted together consistently, and that the majority of the Hammond committee had acted "with the purpose of destroying and eliminating, the rights of said bondholders for the benefit of the Western Pacific Railroad Corporation and of the Missouri Pacific Railroad Corporation." But no sufficient facts were stated, or appear from the record, to substantiate the charge. It may be here noted that no attack whatever was made by petitioner upon the other two committees, or their relations with the trustee.

2. *The Trustee and the Utah Fuel Stock.* The history of this stock has been already outlined. Complaint is made by petitioner because the Bankers' Trust Company did not press to a conclusion the suit in the New

York state court involving the question whether the equity in the stock was covered by the refunding mortgage. This matter will be discussed under the next heading.

[5] 3. *The trustee and the Reorganization Plan.* The disposition of the Utah Fuel stock under the reorganization plan has been set forth. That there was a debatable question whether the equity in the stock came under the refunding mortgage is apparent from the record. It was clear, however, that it would take considerable time to secure a final adjudication of the question. If it turned out that the equity in the stock was covered by the granting clause of the mortgage, then the value of the property to be sold under foreclosure would be enhanced to some extent. If it was not covered by the granting clause, then it could be made available as an asset to the refunding bondholders, if at all, only by application of the doctrine of marshaling, or the doctrine of inverse order of alienation, in connection with the consolidated mortgage. But this latter course was not feasible, for neither the stock itself, nor the owner of the equity therein, nor the trustee under the consolidated mortgage, was within the jurisdiction of the court, nor had there been any default in that mortgage. Lewis v. United States, 92 U. S. 618, 623, 23 L. Ed. 513; Drexler v. Bank (C. C. A. 8) 5 F.(2d) 13.

[6] The reorganization plan provided a disposition of the Utah Fuel stock which gave to the bondholders under the refunding mortgage an immediate beneficial interest in the stock of very considerable value. This disposition met with the approval of three bondholders' committees, representing 84 per cent. of the bonds. It met with the approval of the parties to the litigation in the New York court. It met the approval of the District Court of Colorado. Can it be said that the Bankers' Trust Company, in giving its approval also to this disposition of the stock, acted in bad faith? We think not. It was a matter calling for the exercise of judgment by the trust company. It is not shown by the record that its judgment was not exercised carefully and conscientiously. In view of the provision in the decree that dividends on the Utah Fuel stock should go primarily to pay interest on the bonds and dividends on the stock received by refunding bondholders, it was thought not worth while to carry on a long litigation to have determined the question whether the equity in the stock was covered by the refunding mortgage. The risks involved in delaying the reorganization might well have far outweighed the possible advantage to be gained by following up the litiga-

tion and meanwhile postponing the foreclosure sale. The mere fact that the judgment of petitioner differed from that of the trustee, and of nearly every one else connected with the litigation, has no tendency to show bad faith on the part of the trustee. Shaw v. Railroad, supra; First Nat. Bank v. Shedd, supra. Eighty-four per cent. of the bondholders requested the trustee to proceed to the entry of decree with this provision contained in it. It was the duty of the trustee, under the provisions of the mortgage, to obey this request.

[7] While a court of equity will not allow minority bondholders to be disregarded or unfairly treated in a reorganization plan, yet, on the other hand, it will not lend its aid to a scheme by a minority bondholder of holding up a fair reorganization plan, solely as a means for obtaining greater value or more favorable terms for his bonds than are to be given by the plan to the great majority of the bondholders. Especially is this true if it should appear that the minority bondholder has bought his bonds pending the reorganization and for the purpose of speculating thereon. It was incumbent on the petitioner, in seeking the aid of a court of equity, to show fully his status. But he refused to disclose the time when he became a bondholder, and, though he attacked the default which precipitated foreclosure of the refunding mortgage as having been fraudulently produced, he was yet willing to condone the fraud provided his bonds were paid in full. For a somewhat similar situation, see Simon v. N. O., T. & M. R. Co., 242 F. 62, 155 C. C. A. 6.

[8, 9] As to the upset price fixed in the decree: It is discretionary with the court, but quite common, to fix an upset price. Equitable Trust Co. v. Western Pacific Ry. Co. (D. C.) 233 F. 335; Provident L. & T. Co. v. C. & T. Ry. Co., 177 F. 854, 863, 101 C. C. A. 68. In the case at bar this price was fixed by the court, after full hearing and opportunity for every one interested to be heard. Petitioner was invited to participate in the hearing. An upset price had been suggested by the bondholders' committees or by the reorganization managers. After full hearing, the figures suggested were raised by the court approximately $3,400,000; the final figures being $17,935,700. In view of all the evidence before the court as to estimated value of the property, earning capacity, market price of the refunding bonds during the three years preceding the decree, and other elements proper to be considered, we cannot say that the upset price fixed by the court was too low, nor that the acquiescence therein by the trustee showed either bad faith or bad judgment. Rospigliosi v. New Orleans, etc., R. Co., 237 F. 341, 150 C. C. A. 355.

Appellant has reiterated the statement that a court of equity will not allow stockholders in a corporation to enrich themselves through a mortgage foreclosure, or reorganization plan, or any device, at the expense of the creditors of the corporation, citing N. P. Ry. Co. v. Boyd, 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931; K. C. So. Ry. Co. v. Guardian Trust Co., 240 U. S. 166, 36 S. Ct. 334, 60 L. Ed. 579, and other kindred cases. The principle stated is well recognized, but its application to the case at bar has not been made to appear. The reorganization plan, as heretofore stated, made no provision in regard to the stock of the new Denver Company, and the stockholders, as such, received nothing by that plan. The new stock which was to be received by the Western Pacific Railroad Corporation, a stockholder in the new Denver Company, was not in consideration of its stockholding, but in return for and as an equivalent of the cash and other property contributed by it under the reorganization plan. If petitioner contends that there was some hidden scheme by which the stockholders of the new Denver Company were in fact enriched at his expense, he may still, perhaps, litigate that question by an independent bill.

[10] We reach the conclusions that neither fraud, conspiracy, bad faith, nor bad judgment on the part of the trustee was shown by the fact allegations of the petitions and the affidavits supporting them; that the opposing affidavits and the record showed that the trustee had honestly and efficiently performed its duties under the mortgage; that the trustee represented all of the bondholders, including petitioner, in carrying on the foreclosure suit, and acted therein under authority of bondholders of the requisite amount as provided in the mortgage. There was no combination against petitioner. He was at liberty to join the reorganization plan, even after both of his petitions had been denied. Under the facts and circumstances disclosed, it was discretionary with the court to allow or refuse intervention by petitioner, and the orders denying the same were not appealable. Ex parte Cutting, 94 U. S. 14, 24 L. Ed. 49; Credits Commutation Co. v. United States, 177 U. S. 311, 315, 317, 20 S. Ct. 636, 44 L. Ed. 782; City of New York v. N. Y. Tel. Co., 261 U. S. 312, 43 S. Ct. 372, 67 L. Ed. 673; Buel v. Farmers' Loan & Trust Co., 104 F. 839, 44 C. C. A. 213; Land Title & Trust

Co. v. Asphalt Co., 127 F. 1, 20, 62 C. C. A. 23.

The motion to dismiss the appeals is therefore granted, and the appeals are dismissed.